UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
**Case No. 4:21-cv-10070-JEM**

PENNY PHELPS,

     Plaintiff,                               HON. JOSE E. MARTINEZ

v.

SHERIFF RICK RAMSAY, in his Official
and Individual capacities, CARA HIGGINS,
LAUREN JENAI, and FRANKLIN TUCKER,

     Defendants.

_____/

## PLAINTIFF'S FIRST AMENDED COMPLAINT & RELIANCE
## ON PRIOR DEMAND FOR TRIAL BY JURY

NOW COMES Plaintiff, PENNY PHELPS, by and through her attorneys, THE MASTROMARCO FIRM and the J. SHEK LAW OFFICE, and hereby submits her First Amended Complaint, complaining against Defendants, SHERIFF RICK RAMSAY, in his Official and Individual capacities, CARA HIGGINS, LAUREN JENAI, and FRANKLIN TUCKER, stating as follows:

## COMMON ALLEGATIONS

1.     That Plaintiff is a resident of the County of Monroe, State of Florida and is otherwise domiciled in the State of Florida.

2.     That Defendant SHERIFF RICK RAMSAY is the duly elected sheriff for the County of Monroe, State of Florida and is otherwise domiciled in the State of Florida.

3.     That Defendant CARA HIGGINS is domiciled in the State of Florida.

4.     That Defendant LAUREN JENAI is domiciled in the State of Oregon.

5.     That Defendant FRANKLIN TUCKER is domiciled in the State of Oregon.

6.     That this Honorable Court has jurisdiction over Plaintiff's federal law claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

7.     That Plaintiff is an openly homosexual female.

8.     That Plaintiff has several decades worth of law enforcement experience.

9.     That most recently, Plaintiff was a Captain for the Monroe County Sheriff's Office.

10.     That Defendant Sheriff Rick Ramsay had employed Plaintiff since on or about February 26, 2002.

11.     That Plaintiff was, at all times material hereto, an officer in good standing within the Sheriff's Office and had received numerous accolades and awards, including, but not limited to:

    (a)     Distinguished Service Award;

    (b)     Good Conduct Medal;

    (c)     Hurricane Irma Medal;

    (d)     Hurricane Wilma Medal;

    (e)     Educational Award; and

    (f)     Countless Letters of Commendation.

12.     That on or about November 17, 2017, Matthew Bonnett was brutally stabbed to death during a robbery for crack cocaine and approximately $1,200.

13.     That Mr. Bonnett's murder has been colloquially referred to as the "Treehouse Murder."

14.     That the State of Florida subsequently charged John Travis Johnson, Rory Hank Wilson, and Defendant Franklin Tucker with the murder of Mr. Bonnett.

15.     That at the time of said murder, Plaintiff was the Captain over Monroe County's Major Crimes Unit and, as such, was responsible with several other members of the Sheriff's Office for investigating the Treehouse Murder.

16.     That on or about November 20, 2017, Plaintiff discussed investigative strategy in the Sheriff's Office's Criminal investigation Office.

17.     That at that time, the Sheriff's Office was attempting to verify the identity of Rory "Detroit" Wilson, specifically needing to view his government identification card or obtain his thumbprint.

18.     That on said date, Plaintiff spoke with Deputy Lee Malone on the telephone regarding devising a plan to obtain Wilson's identification card or his thumbprint.

19.     That unbeknownst to Plaintiff or Deputy Malone, Detective/Sergeant David Smith and/or Detective David Fernandez had neglected to turn off recording equipment used to record an interview in a nearby room within the Criminal Investigations Office.

20.     That the failure to turn off the microphone device, allowed a portion of Plaintiff's and Deputy Malone's telephone conversation to be surreptitiously recorded.

21.     That confirming Wilson's identity was important to solving the Treehouse Murder.

22.     That on the night of the Treehouse Murder, one of the victims in the associated robbery, Paula Belmonte, identified one of the suspects as a black male known only as "Detroit."

23.     That on or about November 20, 2017, D./Sgt. Smith and Det. Fernandez learned from a confidential informant that "Detroit" was involved in the Treehouse Murder and was at a Burger King location with a white male, subsequently identified as Defendant Tucker.

24.     That the informant further reported that the two, Defendant Tucker and "Detroit," went to Metro PCS and, with the assistance of Metro PCS, the Sheriff's Office was able to identify

"Detroit" as Rory Wilson.

25.     That the State Attorney's Office instructed that the Sheriff's Office still needed to confirm the identity of Wilson via visual identification or thumbprint.

26.     That because the Sheriff's Office considered Wilson homeless, he presented a significant risk that he may flee the jurisdiction.

27.     That as such, Plaintiff and Deputy Malone discussed how they could confirm Wilson's identity without Wilson perceiving that he was being targeted as part of the murder investigation.

28.     That Plaintiff suggested to Deputy Malone that he hang out in the area near the warehouse where Wilson was staying, in a marked unit, and make a legal traffic stop of Wilson on his bicycle.

29.     That through the legitimate traffic stop, Deputy Malone could then verify Wilson's identity.

30.     That Plaintiff and Deputy Malone were fearful, however, that directly contacting Wilson might alert him as to the fact that the Sheriff's Office was investigating him as part of the Treehouse Murder, which may, in turn, provoke a violent response, the destruction of evidence, or an attempt to flee the jurisdiction.

31.     That as such, Plaintiff and her team needed to deploy a ruse to make Wilson not perceive what was really transpiring.

32.     That Plaintiff told Deputy Malone to play the part of a grumpy old man, who had nothing better to do, a white supremacist, who was simply messing with a minority who was riding a bike.

33.     That in using such a ruse, they could prevent Wilson from being tipped off and

fleeing, while at the same time obtain the information needed for the investigation.

34.     That the ruse was discussed, but no one at the department ever implemented the ruse.

35.     That on the same day, November 20, 2017, detectives who had been detailed to surveil the warehouse observed Wilson shaving his head and discarding clothing in a garbage bag.

36.     That detectives obtained a search warrant for the warehouse and, subsequently, interviewed and arrested Wilson.

37.     That two days later, on or about November 22, 2017, officers arrested the other two suspects, Johnson and Defendant Tucker, eliminating any need to utilize a ruse to identify Wilson.

38.     That as the criminal matters proceeded against the three suspects, Defendant Higgins, an attorney, came to represent Defendant Tucker.

39.     That Defendant Higgins subsequently obtained discovery from Defendant Ramsay and his office.

40.     That in preparing responses to Defendant Higgins's discovery requests, Sheriff's Office personnel uploaded various video and audio recordings to an external storage device.

41.     That Sheriff's Office personnel included an interview conducted by Detective Matt Pitcher and Detective Danielle Malone, which, because a microphone was not turned off, surreptitiously picked up Plaintiff's telephone conversation with Deputy Malone.

42.     That Sheriff's Office personnel clearly did not listen to the entire recording as they caused the disclosure of the conversation between Plaintiff and Deputy Malone, which violated Florida statute and illegally disclosed protected information.

43.     That Sheriff's Office personnel provided the recordings to the State Attorney's Office, which disclosed the recordings to Defendant Higgins.

44.     That while the criminal matters proceeded, Defendant Tucker engaged in a series of recorded phone conversations through the jail phone system with his then girlfriend and now wife, Defendant Jenai.

45.     That in these monitored calls, Defendants Tucker and Jenai identify and hatch a plan they named "Project Mayhem."

46.     That according to the recordings, Project Mayhem was a premeditated plan to discredit Plaintiff and Detective Pitcher.

47.     That the plan included filing multiple Internal Affairs complaints against the two officers so that when questioned at Tucker's murder trial, Plaintiff and Det. Pitcher would have to respond that they were both subject to Internal Affairs investigation.

48.     That Defendants Tucker and Jenai also aimed to have Plaintiff removed from the investigation.

49.     That according to the plan, Plaintiff's removal from the investigation would create a false impression that Plaintiff and Det. Pitcher engaged in misconduct, which may strengthen Tucker's defense, and attack Plaintiff's credibility.

50.      That on or about September 15, 2019, Defendant Tucker began acting upon the preconceived and premeditated plan, Project Mayhem, and submitted a letter to Defendant Sheriff's Internal Affairs Department, alleging various complaints as to how the Tree House Murder was investigated.

51.     That in his complaint, Defendant Tucker outlined criminal charges that he wanted filed against the Plaintiff, including filing false police reports, witness tampering, evidence tampering, manufacturing of evidence, destruction of evidence, coercion, conspiracy and false arrest; Defendant Tucker continued with, "All of these activities seem to be under the direction of

Captain Phelps and Detective Pitcher. . . ."

52.     That this complaint gave rise to Internal Affairs investigation IA-2019-043, regarding events and circumstances surrounding the investigation of case number MCSO17OFF007954, also known as the Treehouse Murder, as well as investigation IA-2019-046, regarding the facts and circumstances surrounding comments and directives, including instructions to be "the neo-Nazi that's picking on the black guy riding a bike" provided to Deputy Lee Malone on November 20, 2017, during a telephone conversation captured on video/audio during investigation regarding MSCO17OFF007954 (hereinafter referred to as the "Neo-Nazi complaint").

53.     That under Florida law, it is illegal to record or intercept a telephone conversation without consent.  *See* FSS 934.03 through 934.09.

54.     That neither Plaintiff nor Deputy Malone consented to the audio recording of the telephone conversation, which is the subject of IA-2019-046 and, ultimately, resulted in Plaintiff's termination, and, as such, the recording violated Florida law.

55.     That, moreover, anyone who intentionally uses or discloses such communications, such as the above, violates the law.  *See* FSS 934.03.

56.     That Plaintiff did not receive a copy of Defendant Tucker's complaint, which violates FSS 112.532(4)(b) and FSS 112.533(2)(a).

57.     That Assistant State Attorney Colleen Dunne informed Plaintiff, Det. Pitcher, and Det. Malone to appear at an evidentiary hearing relating to the criminal matters on October 4, 2019, and to inform other officers to be present.

58.     That the court did not hear the motion and, instead, held a status conference.

59.     That at that time, Defendant Higgins had brought with her to the hearing, a local

reporter.

60.     That Defendant Higgins further took photographs of the officers in attendance as they left the courthouse.

61.     That Defendant Higgins made an internal affairs complaint regarding the officers in the courtroom.

62.     That on or about October 4, 2019, Major Chad Scibilia served upon Plaintiff a Notice of Investigation, IA-2019-039, regarding the officers in the Courtroom.

63.     That in said complaint, Defendant Higgins noted the fact that twenty (20) employees of the Monroe County Sheriff's Office appeared at the October 3, 2019, scheduling conference; however, Defendant Higgins did not allege Plaintiff engaged in any specific misconduct.

64.     That Plaintiff further received a memorandum from Colonel Lou Caputo, notifying Plaintiff that due to the allegations and "in an effort to avoid any appearance of impropriety" Defendant Ramsay was removing Plaintiff from supervision of the Treehouse Murder cases.

65.     That Florida statute governs internal affairs investigations involving law enforcement officers and requires information obtained during the investigation be confidential.

66.     That FSS 112.533(2)(a) provides:

A complaint filed against a law enforcement officer . . . with a law enforcement agency . . . and all information obtained pursuant to the investigation by the agency of the complaint is confidential and exempt from the provisions of s. 119.07(1) until the investigation ceases to be active. . . .

67.     That FSS 112.533(4) provides:

Any person who is a participant in an internal investigation, including the complainant, the subject of the investigation . . ., the investigator conducting the investigation, and any witnesses in the investigation, who willfully discloses any information obtained pursuant to the agency's investigation, including, but not limited to, the identity of the officer under investigation, . . ., information revealed,

or documents furnished in connection with a confidential internal investigation of an agency, before such complaint, document, action, or proceeding becomes a public record as provided in this section commits a misdemeanor of the first class.

68.      That notwithstanding the above statutory provision protecting the confidentiality of the internal affairs investigation, someone from the Sheriff's Office disclosed to Defendant Higgins the October 4, 2019, memorandum from Col. Caputo to Plaintiff.

69.      That Defendant Higgins then utilized the confidential memorandum to Defendant Tucker's advantage, just as schemed and planned and as part of the implementation of "Project Mayhem."

70.      That Defendant Higgins further violated Plaintiff's rights by attaching the memorandum with a motion on October 18, 2019, making the memorandum available to the public.

71.      That on or about October 19, 2019, Defendant Jenai was quoted by The NEW Key West The News Paper, also known as The Blue Paper, stating in a false and defamatory manner:

> "I looked into the case," says Lauren, "The reports said Ty was on surveillance video – he was not.  The reports said a lot of things that ended up not being true. And when I saw there was absolutely no credible evidence against him, I became 100% sure of his innocence."

Arnaud Girard, *TREEHOUSE MURDER: The Investigators Under Investigation*, The Blue Paper, Oct. 19, 2019, https://thebluepaper.com/tree-house-murder-the-investigators-under-investigation/.

72.      That said statement implies that Ms. Phelps inappropriately made false statements or made false police reports, accusing Plaintiff of violating Florida law.  *See* FLA. STAT. § 817.419.

73.      That on or about November 13, 2019, Defendants Higgins and Tucker made a third internal affairs complaint, IA-2019-046.

74.      That in said complaints, Defendants Higgins and Tucker complained that Plaintiff engaged in improper conduct and neglect of duty by directing Deputy Malone "to act like a Neo

Nazi/White Supremacist" while conducting the Treehouse Murder investigation.

75.     That on or about November 14, 2019, Major Scibilia served Plaintiff with a Notice of Investigation for IA-2019-043 and IA-2019-046.

76.     That during a discussion with Major Scibilia, Plaintiff mentioned that she thought it was in her best interest to retain an attorney.

77.     That on the same day, on or about November 14, 2019, Sheriff Ramsay, who was aware of the contents of the audio recording and the substance of the IA-2019-046 complaint, sent Plaintiff a text message, in which he stated:

> On another note, please do not stress too much over the complaint. I know that it is hard, but we have to look into a complaint by Ms. Higgins. Not nice things were said by the Blue Paper and Higgins. We support you and hope to clear your name! Stress after if you believe that you have to at that time. Sorry ☹

78.     That on or about November 19, 2019, Plaintiff met with Col. Caputo and Major Scibilia.

79.     That demonstrating the success of Project Mayhem, Major Scibilia notified Plaintiff that he was recommending Plaintiff's removal from the Major Crimes Unit and the Narcotics Unit.

80.     That said notice further violated Plaintiff's rights as under FSS 112.532(4)(a), Plaintiff was entitled to notice of the action and the reasons for the action prior to its effective date.

81.     That on or about December 2, 2019, Plaintiff's retained attorney spoke with the Sheriff's Office's General Counsel McCullah, specifically identifying concerns about the failure to follow FSS 112.532 *et seq*.

82.     That Plaintiff also spoke with McCullah on the same day and, during said conversation, McCullah repeatedly assured Plaintiff that she would not be demoted or terminated as those actions had not been a topic of discussion.

83.     That McCullah further reassured Plaintiff that she was a valuable member of the Sheriff's Office and part of the team.

84.     That notwithstanding General Counsel McCullah's repeated assurances and on or about December 4, 2019, Plaintiff met with Col. Caputo and Major Scibilia.

85.     That at said time, the colonel and major notified Plaintiff that the decision had been finalized to remove her from supervising the Major Crimes Unit and the Narcotics Unit.

86.     That during said conversation, Col. Caputo and Major Scibilia again assured Plaintiff that there had not been any discussion of demotion or termination, and neither were options for Sheriff Ramsay.

87.     That Major Scibilia further stated that if he had to pick his replacement, it would be Plaintiff and that after things calmed down, she could go back to supervising the Major Crimes Unit.

88.     That in fact, on at least two occasions, Major Scibilia had appointed Plaintiff Acting Major in his absence.

89.     That on or about December 7, 2019, Defendant Higgins posted online, on her Facebook page**,** the following statement:

> "I want you to be the neo-Nazi picking on the black guy riding the bike." This is how a captain at MCSO directs her subordinates to act. Like neo-Nazis. A prosecutor lies and hides evidence. A racist cop who thinks she's above the law. Why do they STILL have jobs?

90.     That below said quote, Defendant Higgins posted a news article, which stated, "[O]fficials may lose jobs in aftermath of murder case."

91.     That in response to Higgins's malicious online comment, in which she encouraged and incited replies, Conway Liner responded with, "they should have a hanging setup one after noon at the court lawn for them." Higgins intentionally and maliciously kept this post on her

Facebook page.

92.     That at Defendant Higgins's prodding, several media outlets began reporting the story of Plaintiff falsely painted as a racist.

93.     That Defendant Higgins contacted a Washington Post reporter, Hannah Knowles.

94.     That Knowles sent the Plaintiff an email that stated,

"Cara Higgins, a defense lawyer for Travis Johnson (sic), just told me their client brought this to the sheriff's attention last month in a letter along with many other complaints about your conduct in this tree house murder case -- she felt, for example, you had been dismissive of defendants' due process and tried to implicate her client. If you have any thoughts on other concerns raised about your handling of the case and now part of the internal investigation, please let me know! And would still love to get your input on everything I mentioned earlier."

95.     That a Washington Post article, published December 9, 2019, stated, "Higgins wants Phelps dismissed from the agency."

96.     That a New York Times article, published December 9, 2019, quoted Higgins stating further defamatory statements concerning the Plaintiff, including: "Her [Plaintiff's] actions were completely egregious, and I think it's despicable and unnecessary," Ms. Higgins said of Captain Phelps.

97.     That this same New York Times articles states, "Memos shared by the sheriff's office show that Captain Phelps was removed from supervision of the tree house murder case in early October.  Last week, the sheriff's office also revoked her command of the drugs and major crimes unit."

98.     That sharing documents in an open internal affairs investigation violates FSS 112.533(4).

99.     Ms. Higgins also reported to the news that the recording involving the alleged racist statements "bolstered her previous efforts to get Phelps taken off the tree house case, she said.

Now, Higgins wants Phelps dismissed from the agency."  "Anyone who uses those words has no place in that department at that level, she said."

100.    That the Plaintiff and Deputy Malone did not consent to the recording of their phone conversation.

101.    That Defendant Higgins received this intercepted recorded phone conversation in connection with a criminal investigation.

102.    That Defendant Higgins released this intercepted recorded phone conversation to various media outlets to improperly obstruct, impede or interfere with a duly authorized criminal investigation in violation of FSS 934.03.

103.    That this intercepted recorded phone conversation was part of an open Internal Affairs complaint that Defendants Higgins and Tucker had filed against the Plaintiff; the contents of the recording should have remained confidential until the investigation was closed and, as such, Defendant Higgins's actions violated FSS 112.533(4).

104.    That on or about December 7, 2019, Defendant Tucker posted on his Facebook page false and defamatory statements regarding Plaintiff, stating, "I'm happy she's finally being outed and yeah the racist set up is bad but setting someone up for murder is so much worse."

105.    That on or about the same day, December 7, 2019, Defendant Tucker posted on his Facebook page additional false and defamatory statements regarding Plaintiff, stating, "While they did release the audio of her racist bullshit, they seem to have left out the parts where she's talking about setting me up. . . ."

106.    That on or about the same day, Defendant Tucker made a comment on a post on his Facebook page, containing false and defamatory statements regarding Plaintiff, stating, "[O]ne of the things she's in trouble for is telling a deputy to play neo-nazi, racist cop to illegally pull Rory

over on his bike".

107.    That on or about December 11, 2019, Defendant Jenai made additional false and

defamatory statements, quoted in the New York Times as saying:

> "I think the bigger story here is really about a very corrupt police department and prosecutor's office in a very small town," she said.

> "Basically, they've been getting away with this kind of thing for years, because mostly they're picking on poor people and homeless people, and they count on the fact that nobody's going to come and look into what they're doing."

Jacey Fortin, *A Sheriff's Captain Told a Deputy to Play the Role of 'White Supremacist'*, N.Y. Times, Dec. 11, 2019, https://www.nytimes.com/2019/12/11/us/captain-penny-phelps-key-west.html.

108.    That the above quoted statement implies that Plaintiff was or is a corrupt law

enforcement officer.

109.     That on or about December 11, 2019, Defendant Tucker posted on his Facebook

page false and defamatory statements regarding Plaintiff, including the following:

> My only real criticism is of the expert Dunn who says her actions were "probably legal." While the acting like a racist may be legal, telling the officer to pull him over for some imagined infraction, is not. Once again, this is the least of what Captain Phelps did wrong in this case but hopefully this topic will shed light on her many other acts of misconduct, namely framing me for murder.

110.    That on or about December 11, 2019, Sheriff Ramsay appeared on a radio show,

"Morning Magazine."

111.    That while speaking regarding Plaintiff and the slanderous allegations of racism,

Sheriff Ramsay said:

> I need all of the information before I can make a decision. I can't make a decision on one complaint that comes in . . . there is due process, and we are in the middle of that due process now.

112.    That Sheriff Ramsay further mentioned that an investigation was being conducted

by an Inspector General.

113.    That in fact, Inspector General Lee Ann Holroyd had assigned Inspector Michelle Maxwell to investigate the internal affairs investigations involving Plaintiff.

114.    That the Sheriff's Office never disclosed or acknowledged that Inspector Maxwell had a significant conflict of interest.

115.    That Inspector Maxwell is a former work colleague and very good friend of Defendant Higgins.

116.    That the two socialize together as Defendant Higgins had previously posted several photographs of the two together on her Facebook page, including a photograph from November 24, 2017, just seven (7) days after the Treehouse Murder, and another photograph on December 6, 2019, while Inspector Maxwell conducted the internal affairs investigations.

117.    That on or about December 12, 2019, Plaintiff's attorney sent Inspector General Holroyd a letter, outlining information about the jailhouse telephone calls in which Defendants Tucker and Jenai discussed "Project Mayhem" and requested an investigation of those calls and further requested interviews of Assistant State Attorney Dunne and Inspector Maxwell.

118.    That FSS 112.532(1)(d) requires that "[a]ll identifiable witnesses shall be interviewed, whenever possible, prior to the beginning of the investigative interview of the accused officer."

119.    That the Sheriff's Office denied Plaintiff her rights by failing to interview Dunne and Maxwell, clearly identifiable witnesses, and by failing to interview Plaintiff.

120.    That the Sheriff's Office ignored Plaintiff's requests for investigation.

121.    That on the same day that Sheriff Ramsay appeared on the radio, December 11, 2019, Defendant Higgins responded by appearing on a different radio program later in the evening.

122.    That during said broadcast, Defendant Higgins stated:

I heard the Sheriff say he is not going to make a decision based on whether or not to terminate Captain Phelps based on one complaint . . . to say this is based upon one complaint of Penny Phelps's behavior is simply outrageous.

123.    That Defendant Higgins continued to defame Plaintiff, accusing Plaintiff of committing crimes:

What Penny Phelps did was botch this investigation.  She created a story in her mind and then manufactured the evidence to fit her narrative.  The actions of Penny Phelps are, in my opinion, criminal and for this to be taken lightly and suggested that it is just one complaint over a poor choice of words is really *despicable*.

124.    That same radio broadcast provided that Defendant Higgins "is conducting her own investigation into the conduct of the sheriff's office and the state attorney."

125.    That on or about December 13, 2019, Defendant Tucker posted on his Facebook page false and defamatory statements regarding Plaintiff, "I'd love to see her not only fired but charged criminally for setting me up."

126.    That on the same day, on or about December 13, 2019, the Sheriff's Office prepared charging documents and the internal affairs summary report for IA-2019-046, which recommended Plaintiff's termination.

127.    That the following day, on or about December 14, 2019, Defendant Tucker posted on his Facebook page false and defamatory statements regarding Plaintiff, "Hopefully, she'll be charged criminally for that shit she did to me!!"

128.    That on or about the same day, December 14, 2019, four Sheriff's Office employees, dressed in tactical vests as if they were conducting a high-risk raid, served upon Plaintiff a notice of termination and took all of Plaintiff's uniforms and equipment and stuffed them into black trash bags.

129.    That as Plaintiff had a property interest in her continued employment, Plaintiff was entitled to a pre-determination hearing prior to Defendant Ramsay made a determination to

discipline her.

130.     That Defendant Ramsay, however, violated Plaintiff's due process rights by making the determination to terminate Plaintiff's employment without affording Plaintiff the opportunity to respond.

131.     That on or about December 18, 2019, Defendant Ramsay made public statements on a radio show called, "The Morning Magazine," regarding Plaintiff prior to any pre-determination hearing, including the statement related to Plaintiff's consideration of a potential ruse involving Deputy Malone acting as a racially biased police officer; Sheriff Ramsay stated that the "Sheriff's Office does not tolerate these types of comments.  I just cannot defend this," indicating that he had already made up his mind to act upon the recommendation to terminate Plaintiff's employment prior to a pre-determination hearing and contradicting the prior assurances given to Plaintiff that he was not considering demotion or termination.

132.     That in violation of her due process rights, Plaintiff was never interviewed as part of the Internal Affairs investigative process for any of the complaints made by Defendants Higgins and Tucker.

133.     That even though Plaintiff was never allowed to respond to the allegations made by Defendants Higgins and Tucker, Colonel Caputo and Major Scibilia tendered memos to Defendant Ramsay recommending Plaintiff's termination prior to the pre-determination hearing; that this also violated Plaintiff's due process rights.

134.     That on or about December 19, 2019, Plaintiff attended a sham pre-determination hearing with her attorney.

135.     That during said hearing, Plaintiff read a statement denying any wrongdoing and her attorney further outlined how the Sheriff's Office had on numerous occasions failed to comply

with the procedure set forth in the Florida Law Enforcement Officers' and Correctional Officers' Bill of Rights, including, but not limited to, failing to disclose the conflict of interest by Inspector Maxwell, failing to review all existing evidence in violation of FSS 112.532(1)(d) and FSS 112.533(2)(a), and by closing the investigation, which effectively denied Plaintiff the right to seek review of the investigator's violations through a compliance review hearing in violation of FSS 112.534.

136.     That following the pre-determination hearing and at approximately 3:00 p.m., Defendant Ramsay terminated Plaintiff's employment.

137.     That all Defendants acted in accordance with the goals articulated in the scheme named "Project Mayhem," as Defendants successfully, yet baselessly, filed internal affairs complaints against Plaintiff, which lead to her removal from the Treehouse Murder investigation, and, ultimately, her removal from employment with the Monroe County Sheriff's Office.

138.     That in furtherance of Project Mayhem and on or about December 20, 2019, Defendant Tucker and Defendant Jenai appeared on the Sean Hannity Show, a radio show, hosted on this occasion by Jonathan Gilliam.

139.     That both Defendants Tucker and Jenai made false and defamatory statements relating to Plaintiff.

140.     That these include statements that evidence had been manipulated and that a video had been manipulated, edited, and altered.

141.     That Defendant Tucker further made false and defamatory statements, including that Plaintiff "got in trouble for some racially motivated comments she made and directing officers to make illegal stops. . . ."

142.     That also on or about December 20, 2019, a video recording of Defendant Tucker

was posted to the "Free Franklin Tucker" YouTube channel, entitled, "Franklin Tyrone Tucker on Captain Penny Phelps 12/16/2019 Part 1."

143.    That in said video, Defendant Tucker defames Plaintiff, accusing her of instructing a subordinate law enforcement officer to make an illegal traffic stop.

144.    That Defendants Tucker, Jenai, and Higgins utilized the "Free Franklin Tucker" Facebook page and YouTube channel to spread false and defamatory information about Plaintiff and to falsely paint Plaintiff as a racist and corrupt cop who "framed" Defendant Tucker.

145.    That these prejudicial, extrajudicial comments jeopardized the ability of the State and the defendants to have a fair trial.

146.    That Judge Mark Jones, the presiding judge over the criminal trial, issued a protective order to prevent extrajudicial comments on May 8, 2020.

147.    That Judge Jones ordered all attorneys to abide by Florida Rule of Professional Conduct 4-3.6.

148.    That Judge Jones prohibited all defendants and Ms. Jenai from making any prejudicial pretrial comments intended for publication.

149.    That despite the protective order, Defendants Jenai and Tucker appeared in an interview in the New York Post on November 23, 2020.

150.    That Defendant Tucker was wearing a "not guilty" shirt in one of the pictures in the article.

151.    That in the article, Defendant Tucker said, "If we declared ready for trial today, there is no way the prosecution would be ready.  They don't have a case."

152.    That in the article, Defendant Jenai said, "What if somebody framed me for murder and there was nobody there to help?"

153. That on February 4, 2021, Judge Jones ruled that Defendants Jenai and Tucker had violated the protective order to prevent extrajudicial comment by appearing in the New York Post interview.

154. That Judge Jones declined to conduct a show cause hearing because he did not want to further jeopardize the ability to hold a fair trial.

155. That Defendant Ramsay's reasons for terminating Plaintiff's employment are pretextual in nature.

156. That Defendant Ramsay's reasons for terminating Plaintiff's employment are either not based in fact, did not actually motivate the decision, and/or were too insignificant to warrant the action taken.

157. That Defendant Ramsay purportedly terminated Plaintiff for considering using a ruse involving a deputy pretending to be a racist cop, while at the same time, Defendant Ramsay and the Sheriff's Office regularly utilizes ruses where deputies and detectives pose as individuals who have engaged in or are trying to engage in immoral and unlawful behavior, including:

(a) Individuals who had stolen marijuana plants and demanded ransom to get the plants back to lure the owner of the plants to identify himself;

(b) Underage children who lured pedophiles to engage in illegal conversations and in-person meetings;

(c) An individual looking to purchase a child to identify individuals attempting to sell their children;

(d) An inmate to investigate and exposed corrupt detention deputies;

(e) Individuals who are or were attempting to become gang members;

(f) Individuals looking to illegally buy firearms and stage a robbery at a gun store;

(g) Individuals posing as buyers of counterfeit money;

(h)     An individual posed as a drug dealer to make a drug sale;

(i)     An individual attempted to illegally purchase a hand gun;

(j)     Individuals posed as men wanting illicit massages from a "massage parlor";

(k)     Individuals posed as persons looking to bet on illegal dog fights;

(l)     Drug addicts and/or prostitutes to infiltrate drug trafficking rings;

(m)     Individuals looking to solicit prostitution or, colloquially referred to as "johns"; and

(n)     Prostitutes.

158.    That unlike in Plaintiff's situations, those deputies, detectives, and other officers that implemented the above ruses were not accused of wrongdoing for considering the use of immoral and unlawful ruses and the thoughts and sensibilities of the character being played were not imputed to the officer.

159.    That in other words, male officers that pretended to solicit sex from female prostitutes were not accused of being sexual harassers or discriminators against women; however, Plaintiff who considered a ruse involving an officer pretending to be racist was falsely accused of being a racist.

160.    That Defendant Ramsay has failed to discipline or discharge similarly situated male, heterosexual employees for engaging in the same or worse behavior that Plaintiff was alleged to have engaged in.

161.    That as an example, in April 2017, a male, heterosexual sergeant racially profiled a Hispanic male, questioning his immigration status, while he lied on the ground injured, which received national media attention.

162.    That in June 2017, the Miami Herald ran a story regarding the episode of racial profiling, which, quoting the sergeant as questioning the male prior to offering medical assistance:

"You illegal? Are you a legal citizen or no? Speak English? You got ID? Passport, visa, or what?" [The sergeant] barks at the injured man, a police body camera capturing the interaction.

163.    That the same sergeant engaged in a second episode of racial profiling in May 2017.

164.    That in said situation, the male, heterosexual sergeant questioned another Hispanic male regarding his immigration status and contacted Border Patrol to pick up the Hispanic male.

165.    That whereas Plaintiff only considered having an officer *pretend* to be racist, this sergeant actually engaged in racist practices, including racially profiling.

166.    That Plaintiff and said sergeant were subject to the same standards and policies.

167.    That whereas Defendant Ramsay publicly commented on the situation involving Plaintiff, he had refused to publicly comment on the above-referenced sergeant's instances of racial profiling.

168.    That Defendant Ramsay also failed to terminate the above-referenced sergeant, even though said behavior was recorded on camera and reported in national news media.

169.    That Defendant Ramsay has further fostered a discriminatory atmosphere towards women, especially lesbian employees.

170.    That Defendant Ramsay refers to all deputies, regardless of whether those deputies are male, female, or nonbinary as "lawmen."

171.    That Plaintiff had previously reported Defendant Ramsay's use of "lawmen" to both General Counsel McCullah and Major Scibilia; however, Defendant Ramsay continues to use such language.

172.    That Defendant Ramsay further refers to male supervisors by their rank, such as Major Scibilia, while, at the same time, refers to female supervisors by "Miss," such as "Miss Phelps" or "Miss Penny" as opposed to Captain Phelps.

173.    That Plaintiff had previously reported Defendant Ramsay's disparate treatment of female supervisors to General Counsel McCullah; however, Defendant Ramsay continued to use such language.

174.    That the Sheriff's Office has further tolerated discriminatory and insubordinate statements made by heterosexual, male employees.

175.    That on one occasion, a sergeant referred to Plaintiff as "my dumb, cunt captain" in front of a room full of recruits and this was allegedly investigated by Major Scibilia.

176.    That the Sheriff's Office did not terminate or demote the sergeant.

177.    That Defendant Ramsay engaged in disparate treatment of employees involved in investigating the Treehouse Murder.

178.    That Detective/Lieutenant James Norman directed his subordinate officer, Det. Danielle Malone, to illegally access emergency contact information for Rory Wilson's girlfriend.

179.    That an Internal Affairs investigation was conducted regarding Det. Malone's conduct.

180.    That Det./Lt. Norman provided a statement, under oath, that he gave Det. Malone the order to access the emergency contact information.

181.    That the Internal Affairs investigation concluded that Det. Malone should have known that Det./Lt. Norman's order was illegal and sustained a charge of neglect of duty.

182.    That Det. Malone received a written reprimand.

183.    That Det./Lt. Norman, a heterosexual male, who issued the illegal order, was never investigated or disciplined; in fact, he received a promotion to the rank of captain.

184.    That Plaintiff was accused of neglect of duty because subordinate officers mishandled evidence; Defendant Ramsay did not similarly accuse other heterosexual, male

commanding officers of neglect of duty for similar or worse behavior.

185.    That although Plaintiff oversaw the Major Crimes Unit, Detective/Sergeant Christian Kellenberger was responsible for the day-to-day operations.

186.    That Det./Sgt. Kellenberger further reported to Norman.

187.    That neither Norman nor Kellenberger were accused or held responsible for subordinate officers' mishandling of evidence.

188.    That on the night of the murder, Kellenberger retrieved the victim's belongings. Kellenberger placed the victim's bloody clothing in a plastic bag and deposited the plastic bag in Det. Pitcher's office.

189.    That Kellenberger failed to complete a property/evidence receipt and failed to place the bloody clothing into evidence.

190.    That Defendant Ramsay did not accuse Kellenberger, a heterosexual, male, of neglect of duty, never investigated him for his misconduct, and did not discipline him.

191.    That instead, Defendant Ramsay subsequently promoted Kellenberger to the rank of lieutenant.

192.    That Det. Fernandez and Det./Sgt. Smith were responsible for the interview room and failed to turn off recording equipment, which led to the Plaintiff and Deputy Malone being recorded in violation of law.

193.    That even though Defendant Ramsay apologized to the State Attorney's Office for this incident, Det./Sgt. Smith and Det. Fernandez were never investigated or disciplined.

194.    That Defendant Ramsay further promoted Det. Fernandez to the rank of sergeant and Det./Sgt. Smith to the rank of lieutenant. Both Fernandez and Smith are heterosexual, males.

195.    That Defendant Ramsay has also permitted and cultivated a heterosexually charged

environment to exist at the Sheriff's Office.

196.    That during a fundraiser, Defendant Ramsay appeared on stage, sitting backward on a chair, waiving a cat-o-nine tails over his head and towards Michelle Maxwell, a female attorney who works for the Sheriff's Office, and appeared in a man's white dress shirt and no pants; and at the same time, Captain Jon Crane**,** dressed in a trench coat**,** cheered them on.

197.    That Defendant Ramsay has also tolerated Major Scibilia and Col. Caputo making several social media posts objectifying women.

198.    That on another occasion, Plaintiff attended a conference held by the Florida Law Enforcement Gays and Lesbians.

199.    That Defendant Ramsay also attended the event, and, at one point, a group of gay men requested Defendant Ramsay's telephone number from Plaintiff and were questioning Ramsay's sexual orientation.

200.    That Plaintiff notified the group that Defendant Ramsay was not gay and did not participate in the conversation any further, however, Plaintiff's girlfriend who was also at the event, continued in the conversation.

201.    That, Ramsey was informed of the conversation by a Sherriff's office employee, and on the following day, Defendant Ramsay called Plaintiff into his office.

202.    That Defendant Ramsay became very angry and adamantly insisted he was not gay and cautioned that "you won't like it unless you can keep your girlfriend under control."

203.    That another example of Defendant Ramsay tolerating heterosexual, male misconduct, involved a male deputy grabbing a female deputy's breast in front of several other deputies.

204.    That said event was witnessed by a member of the command staff, a sergeant, and

said action constituted a battery.

205.     That the deputy who engaged in the battery subsequently received a promotion to the rank of sergeant and neither the deputy who engaged in the battery nor the sergeant who failed to act upon or respond to the battery, received any discipline.

206.     That Defendant Ramsay's actions constitute discrimination because of sex and/or sexual orientation in violation of 42 U.S.C. § 1983 and the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.

207.     That Defendant Ramsay's actions constitute discrimination because of sex and/or sexual orientation in violation of Title VII of the Civil Rights Act.

208.     That Plaintiff has obtained a right to sue letter.

209.     That Defendants' actions constitute violations of law enforcement officers' rights.

210.     That Defendant Ramsey's actions constitute defamation.

211.     That Defendant Higgins's actions constitute defamation.

212.     That Defendant Tucker's actions constitute defamation.

213.     That Defendant Jenai's actions constitute defamation.

214.     That Defendants Higgins's, Jenai's, and Tucker's actions constitute tortious interference with a business relationship.

215.     That Defendants' actions constitute a civil conspiracy.

216.     That as a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered and will continue to suffer economic damages, including, but not limited to, lost wages, back pay, front pay, raises, bonuses, health, dental, vision, and/or life insurance benefits, short-term and/or long-term disability benefits, pension and/or retirement benefits, investment opportunities, employer contributions, and any other compensation and fringe benefits lost to

Plaintiff as a result of Defendants' actions along with an additional amount to offset any negative tax consequences incurred as a result of recovery.

217.   That as a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered and will continue to suffer noneconomic damages, including, but not limited to, emotional distress, mental anguish, shock, fright, embarrassment, humiliation, nervousness, anxiety, depression, denial of social pleasures, and disruption of lifestyle.

218.   That Plaintiff hereby claims compensatory and punitive damages pursuant to 42 U.S.C. § 1981a.

219.   That Plaintiff hereby claims reasonable attorney fees pursuant to 42 U.S.C. § 2000e-5(k).

220.   That Plaintiff hereby claims the costs of this action and reasonable attorney fees pursuant to 42 U.S.C. § 1988(b).

221.   That Plaintiff further claims expert witness fees pursuant to 42 U.S.C. § 1988(c).

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment in her favor in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00) in addition to costs, interest, and attorney fees along with any and all legal and/or equitable relief this Court deems just.

### COUNT I – SEX AND/OR SEXUAL ORIENTATION DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1983 & THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION BY DEFENDANT RAMSAY

222.   That Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1 through 221 of her Common Allegations, word for word and paragraph for paragraph, as if fully restated herein.

223.   That 42 U.S.C. § 1983 provides that every person who, under the color of State law,

deprives a citizen of the United States any rights or privileges secured by the Constitution shall be liable to the injured party at law or in equity.

224.     That the Fourteenth Amendment to the United States Constitution provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. CONST. amend. XIV, § 1.

225.     That at all times material hereto, Defendant Ramsay acted under the color of State law.

226.     That there is an equal protection right to be free from employment discrimination, including discrimination because of sex and/or sexual orientation.  *See Williams v. Consol. City of Jacksonville*, 341 F.3d 1261, 1268 (11th Cir. 2003); *Bailey v. Mansfield Independent Sch. Dist.*, 425 F. Supp. 3d 696 (N.D. Tex. 2019); *Glover v. Williamsburg Local Sch. Dist. Bd. of Educ.*, 20 F. Supp. 2d 1160 (S.D. Ohio 1998).

227.     That Defendant Ramsay subjected Plaintiff to discriminatory treatment because of Plaintiff's sex and/or sexual orientation.

228.     That at all times material hereto, Plaintiff was and is a member of an identifiable class by virtue of her sex, female, and sexual orientation, homosexual.

229.     That at all times material hereto, Plaintiff was and is qualified for the position she held, captain.

230.     That Defendant Ramsay took materially adverse employment actions against Plaintiff, including, but not limited to, removing Plaintiff from supervision of the Treehouse Murder investigation, removing Plaintiff from supervision of the Major Crimes Unit, removing Plaintiff from supervision of the Narcotics Unit, and terminating Plaintiff's employment.

231.     That Plaintiff suffered said materially adverse employment actions under

THE MASTROMARCO FIRM | 1024 N. Michigan Avenue | Saginaw, Michigan 48602 | (989) 752-1414

circumstances that give rise to an inference of sex and/or sexual-orientation discrimination.

232.    That Defendant Ramsay's actions were not substantially related to the furtherance of an important government interest.  *Danskine v. Metro Dade County Fire Dep't*, 59 F. Supp. 2d 1252, 1256 (S.D. Fla. 1999).

233.    That Defendant Ramsay treated Plaintiff less preferentially than similarly situated employees outside of Plaintiff's protected class.

234.    That Defendant Ramsay's proffered reasons for taking the above-referenced adverse employment actions are pretextual in nature.

235.    That Defendant Ramsay's proffered reasons for taking the above-referenced adverse employment actions are either not based in fact, did not actually motivate the decision, and/or were too insignificant to warrant the action taken.

236.    That Plaintiff's equal protection rights to be free from employment discrimination were and are clearly established.

237.    That Defendant Ramsay is not entitled to qualified immunity.

238.    That at all times material hereto, Defendant Ramsay acted pursuant to a policy or custom.

239.    That at all times material hereto, Defendant Ramsay made the decisions to take materially adverse employment action against Plaintiff and to violate her equal protection rights.

240.    That Defendant Ramsay's liability is direct.

241.    That Defendant Ramsay exercised final policy-making authority for the Monroe County Sheriff's Office.

242.    That Defendant Ramsay as a municipality is liable for the above-referenced discrimination.

THE MASTROMARCO FIRM | 1024 N. Michigan Avenue | Saginaw, Michigan 48602 | (989) 752-1414

243.    That Defendant Ramsay's actions constitute discrimination because of sex and/or sexual orientation in violation of 42 U.S.C. § 1983 and the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.

244.    That as a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered and will continue to suffer economic damages, including, but not limited to, lost wages, back pay, front pay, raises, bonuses, health, dental, vision, and/or life insurance benefits, short-term and/or long-term disability benefits, pension and/or retirement benefits, investment opportunities, employer contributions, and any other compensation and fringe benefits lost to Plaintiff as a result of Defendants' actions along with an additional amount to offset any negative tax consequences incurred as a result of recovery.

245.    That as a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered and will continue to suffer noneconomic damages, including, but not limited to, emotional distress, mental anguish, shock, fright, embarrassment, humiliation, nervousness, anxiety, depression, denial of social pleasures, and disruption of lifestyle.

246.    That Plaintiff hereby claims the costs of this action and reasonable attorney fees pursuant to 42 U.S.C. § 1988(b).

247.    That Plaintiff further claims expert witness fees pursuant to 42 U.S.C. § 1988(c).

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment in her favor in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00) in addition to costs, interest, and attorney fees along with any and all legal and/or equitable relief this Court deems just.

## COUNT II – SEX AND/OR SEXUAL ORIENTATION DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT BY DEFENDANT RAMSAY

THE MASTROMARCO FIRM | 1024 N. Michigan Avenue | Saginaw, Michigan 48602 | (989) 752-1414

248.     That Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1 through 221 of her Common Allegations and paragraphs 222 through 247 of Count I, word for word and paragraph for paragraph, as if fully restated herein.

249.     That Title VII of the Civil Rights Act makes it an unlawful employment practice to discharge any individual or otherwise discriminate against any individual with respect to her compensation, terms, conditions, or privileges of employment, because of such individual's sex. 42 U.S.C. § 2000e-2(a)(1).

250.     That the term "sex" includes not only biological sex, but also sexual orientation. *Glenn v. Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011); *Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731, 1754 (2020).

251.     That Defendant Ramsay subjected Plaintiff to discriminatory treatment because of Plaintiff's sex and/or sexual orientation.

252.     That at all times material hereto, Plaintiff was and is a member of a protected class by virtue of her sex, female, and sexual orientation, homosexual.

253.     That at all times material hereto, Plaintiff was and is qualified for the position she held, captain.

254.     That Defendant Ramsay took materially adverse employment actions against Plaintiff, including, but not limited to, removing Plaintiff from supervision of the Treehouse Murder investigation, removing Plaintiff from supervision of the Major Crimes Unit, removing Plaintiff from supervision of the Narcotics Unit, and terminating Plaintiff's employment.

255.     That Plaintiff suffered said materially adverse employment actions under circumstances that give rise to an inference of sex and/or sexual-orientation discrimination.

256.     That Defendant Ramsay treated Plaintiff less preferentially than similarly situated

employees outside of Plaintiff's protected class.

257.    That Defendant Ramsay's proffered reasons for taking the above-referenced adverse employment actions are pretextual in nature.

258.    That Defendant Ramsay's proffered reasons for taking the above-referenced adverse employment actions are either not based in fact, did not actually motivate the decision, and/or were too insignificant to warrant the action taken.

259.    That Defendant Ramsay's actions constitute discrimination because of sex and/or sexual orientation in violation of Title VII of the Civil Rights Act.

260.    That as a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered and will continue to suffer economic damages, including, but not limited to, lost wages, back pay, front pay, raises, bonuses, health, dental, vision, and/or life insurance benefits, short-term and/or long-term disability benefits, pension and/or retirement benefits, investment opportunities, employer contributions, and any other compensation and fringe benefits lost to Plaintiff as a result of Defendants' actions along with an additional amount to offset any negative tax consequences incurred as a result of recovery.

261.    That as a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered and will continue to suffer noneconomic damages, including, but not limited to, emotional distress, mental anguish, shock, fright, embarrassment, humiliation, nervousness, anxiety, depression, denial of social pleasures, and disruption of lifestyle.

262.    That Plaintiff hereby claims compensatory and punitive damages pursuant to 42 U.S.C. § 1981a.

263.    That Plaintiff hereby claims reasonable attorney fees pursuant to 42 U.S.C. § 2000e-5(k).

THE MASTROMARCO FIRM | 1024 N. Michigan Avenue | Saginaw, Michigan 48602 | (989) 752-1414

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment in her favor in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00) in addition to costs, interest, and attorney fees along with any and all legal and/or equitable relief this Court deems just.

## COUNT III – VIOLATIONS OF LAW ENFORCEMENT OFFICERS' RIGHTS AGAINST DEFENDANT RAMSAY & HIGGINS

264.    That Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1 through 221 of her Common Allegations, paragraphs 222 through 247 of Count I, and paragraphs 248 through 263 of Count II, word for word and paragraph for paragraph, as if fully restated herein.

265.    That Florida statutes govern internal affairs investigations involving law enforcement officers and require information obtained during the investigation be confidential.

266.    That FSS 112.533(2)(a) provides:

A complaint filed against a law enforcement officer . . . with a law enforcement agency . . . and all information obtained pursuant to the investigation by the agency of the complaint is confidential and exempt from the provisions of s. 119.07(1) until the investigation ceases to be active. . . .

267.    That FSS 112.533(4) provides:

Any person who is a participant in an internal investigation, including the complainant, the subject of the investigation . . ., the investigator conducting the investigation, and any witnesses in the investigation, who willfully discloses any information obtained pursuant to the agency's investigation, including, but not limited to, the identity of the officer under investigation, . . . information revealed, or documents furnished in connection with a confidential internal investigation of an agency, before such complaint, document, action, or proceeding become a public record as provided in this section commits a misdemeanor of the first class.

268.    That notwithstanding the above statutory provisions protected the confidentiality of the internal affairs investigation, someone from the Sheriff's Office disclosed to Defendant Higgins the October 4, 2019 memorandum from Col. Caputo to Plaintiff.

269.     That Defendant Higgins then utilized the confidential memorandum to Defendant Tucker's advantaged, just as schemed and planned and as part of the implementation of "Project Mayhem."

270.     That Defendant Higgins further violated Plaintiff's rights by attaching the memorandum with a motion on October 18, 2019, making the memorandum available to the public.

271.     That Defendant Higgins did not stop there.

272.     That Defendant Higgins further intentionally disclosed the memorandum to various media outlets.

273.     That Defendant Ramsay did not interview all identifiable witnesses and/or gather all evidence in violation of FSS 112.533(1)(d).

274.     That Defendant Ramsay moved Plaintiff from supervision from the Tree House Murder case on October 4, 2019 in violation of FSS 112.532(4)(a).

275.     That Defendants both released and discussed information that was part of an open internal affairs complaint in violation of FSS 112.533(4).

276.     That both Defendants did violate the above said statutes by further disclosing and discussing matters with various news media and other sources of publication and, as such, violated Plaintiff's rights under said Act.

277.     That Defendants' specific actions are outlined in the Common Allegations.

278.     That Defendants' actions constitute violations of Law Enforcement Officer Rights statutes.

279.     That as a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered and will continue to suffer economic damages, including, but not limited to, lost wages,

back pay, front pay, raises, bonuses, health, dental, vision, and/or life insurance benefits, short-term and/or long-term disability benefits, pension and/or retirement benefits, investment opportunities, employer contributions, and any other compensation and fringe benefits lost to Plaintiff as a result of Defendants' actions along with an additional amount to offset any negative tax consequences incurred as a result of recovery.

280.    That as a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered and will continue to suffer noneconomic damages, including, but not limited to, emotional distress, mental anguish, shock, fright, embarrassment, humiliation, nervousness, anxiety, depression, denial of social pleasures, and disruption of lifestyle.

281.    That Plaintiff hereby claims any and all costs, interest, and attorney fees permitted by Court Rule, statute, and/or common law.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment in her favor in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00) in addition to costs, interest, and attorney fees along with any and all legal and/or equitable relief this Court deems just.

## <u>COUNT IV – DEFAMATION AGAINST DEFENDANT RAMSAY</u>

282.    That Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1 through 221 of her Common Allegations, paragraphs 222 through 247 of Count I, paragraphs 248 through 263 of Count II, and paragraphs 264 through 281 of Count III, word for word and paragraph for paragraph, as if fully restated herein.

283.    That Defendant Ramsay published various defamatory statements as set forth in Plaintiff's Common Allegations.

284.    That said statements tended to subject Plaintiff to hatred, distrust, ridicule,

contempt, and/or disgrace and further tended to injure Plaintiff in her business and profession.

285.    That said statements were not statements of opinion.

286.    That said statements were factually false.

287.    That Defendant Ramsay acted with knowledge that said statements were false and/or with reckless disregard to the falsity of the statements.

288.    That Plaintiff suffered actual damages.

289.    That Defendant Ramsay's actions constitute defamation.

290.    That as a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered and will continue to suffer economic damages, including, but not limited to, lost wages, back pay, front pay, raises, bonuses, health, dental, vision, and/or life insurance benefits, short-term and/or long-term disability benefits, pension and/or retirement benefits, investment opportunities, employer contributions, and any other compensation and fringe benefits lost to Plaintiff as a result of Defendants' actions along with an additional amount to offset any negative tax consequences incurred as a result of recovery.

291.    That as a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered and will continue to suffer noneconomic damages, including, but not limited to, emotional distress, mental anguish, shock, fright, embarrassment, humiliation, nervousness, anxiety, depression, denial of social pleasures, and disruption of lifestyle.

292.    That Plaintiff hereby claims any and all costs, interest, and attorney fees permitted by Court Rule, statute, and/or common law.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment in her favor in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00) in addition to costs, interest, and attorney fees along with any and all legal and/or equitable relief this

Court deems just.

## COUNT V – DEFAMATION AGAINST DEFENDANT HIGGINS

293.     That Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1 through 221 of her Common Allegations, paragraphs 222 through 247 of Count I, paragraphs 248 through 263 of Count II, paragraphs 264 through 281 of Count III, and paragraphs 282 through 292 of Count IV, word for word and paragraph for paragraph, as if fully restated herein.

294.     That Defendant Higgins published various defamatory statements as set forth in Plaintiff's Common Allegations.

295.     That said statements tended to subject Plaintiff to hatred, distrust, ridicule, contempt, and/or disgrace and further tended to injure Plaintiff in her business and profession.

296.     That said statements were not statements of opinion.

297.     That said statements were factually false.

298.     That Defendant Higgins acted with knowledge that said statements were false and/or with reckless disregard to the falsity of the statements.

299.     That Plaintiff suffered actual damages.

300.     That Defendant Higgins's actions constitute defamation.

301.     That as a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered and will continue to suffer economic damages, including, but not limited to, lost wages, back pay, front pay, raises, bonuses, health, dental, vision, and/or life insurance benefits, short-term and/or long-term disability benefits, pension and/or retirement benefits, investment opportunities, employer contributions, and any other compensation and fringe benefits lost to Plaintiff as a result of Defendants' actions along with an additional amount to offset any negative

THE MASTROMARCO FIRM | 1024 N. Michigan Avenue | Saginaw, Michigan 48602 | (989) 752-1414

tax consequences incurred as a result of recovery.

302.     That as a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered and will continue to suffer noneconomic damages, including, but not limited to, emotional distress, mental anguish, shock, fright, embarrassment, humiliation, nervousness, anxiety, depression, denial of social pleasures, and disruption of lifestyle.

303.     That Plaintiff hereby claims any, and all costs, interest, and attorney fees permitted by Court Rule, statute, and/or common law.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment in her favor in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00) in addition to costs, interest, and attorney fees along with any and all legal and/or equitable relief this Court deems just.

## COUNT VI – DEFAMATION AGAINST DEFENDANT TUCKER

304.     That Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1 through 221 of her Common Allegations, paragraphs 222 through 247 of Count I, paragraphs 248 through 263 of Count II, paragraphs 264 through 281 of Count III, paragraphs 282 through 292 of Count IV, and paragraphs 293 through 303 of Count V, word for word and paragraph for paragraph, as if fully restated herein.

305.     That Defendant Tucker published various defamatory statements as set forth in Plaintiff's Common Allegations.

306.     That said statements tended to subject Plaintiff to hatred, distrust, ridicule, contempt, and/or disgrace and further tended to injure Plaintiff in her business and profession.

307.     That said statements were not statements of opinion.

308.     That said statements were factually false.

309.    That Defendant Tucker acted with knowledge that said statements were false and/or with reckless disregard to the falsity of the statements.

310.    That Plaintiff suffered actual damages.

311.    That Defendant Tucker's actions constitute defamation.

312.    That as a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered and will continue to suffer economic damages, including, but not limited to, lost wages, back pay, front pay, raises, bonuses, health, dental, vision, and/or life insurance benefits, short-term and/or long-term disability benefits, pension and/or retirement benefits, investment opportunities, employer contributions, and any other compensation and fringe benefits lost to Plaintiff as a result of Defendants' actions along with an additional amount to offset any negative tax consequences incurred as a result of recovery.

313.    That as a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered and will continue to suffer noneconomic damages, including, but not limited to, emotional distress, mental anguish, shock, fright, embarrassment, humiliation, nervousness, anxiety, depression, denial of social pleasures, and disruption of lifestyle.

314.    That Plaintiff hereby claims any, and all costs, interest, and attorney fees permitted by Court Rule, statute, and/or common law.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment in her favor in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00) in addition to costs, interest, and attorney fees along with any and all legal and/or equitable relief this Court deems just.

## <u>COUNT VII – DEFAMATION AGAINST DEFENDANT JENAI</u>

315.    That Plaintiff hereby incorporates by reference the allegations contained in

paragraphs 1 through 221 of her Common Allegations, paragraphs 222 through 247 of Count I, paragraphs 248 through 263 of Count II, paragraphs 264 through 281 of Count III, paragraphs 282 through 292 of Count IV, paragraphs 293 through 303 of Count V, and paragraphs 304 through 314 of Count VI, word for word and paragraph for paragraph, as if fully restated herein.

316.   That Defendant Jenai published various defamatory statements as set forth in Plaintiff's Common Allegations.

317.   That said statements tended to subject Plaintiff to hatred, distrust, ridicule, contempt, and/or disgrace and further tended to injure Plaintiff in her business and profession.

318.   That said statements were not statements of opinion.

319.   That said statements were factually false.

320.   That Defendant Jenai acted with knowledge that said statements were false and/or with reckless disregard to the falsity of the statements.

321.   That Plaintiff suffered actual damages.

322.   That Defendant Jenai's actions constitute defamation.

323.   That as a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered and will continue to suffer economic damages, including, but not limited to, lost wages, back pay, front pay, raises, bonuses, health, dental, vision, and/or life insurance benefits, short-term and/or long-term disability benefits, pension and/or retirement benefits, investment opportunities, employer contributions, and any other compensation and fringe benefits lost to Plaintiff as a result of Defendants' actions along with an additional amount to offset any negative tax consequences incurred as a result of recovery.

324.   That as a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered and will continue to suffer noneconomic damages, including, but not limited to, emotional

THE MASTROMARCO FIRM | 1024 N. Michigan Avenue | Saginaw, Michigan 48602 | (989) 752-1414

distress, mental anguish, shock, fright, embarrassment, humiliation, nervousness, anxiety, depression, denial of social pleasures, and disruption of lifestyle.

325.     That Plaintiff hereby claims any, and all costs, interest, and attorney fees permitted by Court Rule, statute, and/or common law.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment in her favor in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00) in addition to costs, interest, and attorney fees along with any and all legal and/or equitable relief this Court deems just.

## COUNT VIII – TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP AGAINST DEFENDANTS HIGGINS, TUCKER & JENAI

326.     That Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1 through 221 of her Common Allegations, paragraphs 222 through 247 of Count I, paragraphs 248 through 263 of Count II, paragraphs 264 through 281 of Count III, paragraphs 282 through 292 of Count IV, paragraphs 293 through 303 of Count V, paragraphs 304 through 314 of Count VI, and paragraphs 315 through 325 of Count VII, word for word and paragraph for paragraph, as if fully restated herein.

327.     That at all times material hereto, Plaintiff had a business relationship with the Monroe County Sheriff's Office by virtue of her employment.

328.     That at all times material hereto, Defendants Higgins, Tucker, and Jenai had knowledge of Plaintiff's business relationship with the Monroe County Sheriff's Office.

329.     That Defendants Higgins, Tucker, and Jenai intentionally interfered with Plaintiff's business relationship.

330.     That Defendants acted in a concreted fashion as part of "Project Mayhem" with the stated purpose of discrediting Plaintiff and having her removed from her employment with the

Monroe County Sheriff's Office.

331.    That Defendants Higgins, Tucker, and Jenai's interference was unjustified.

332.    That Defendants Higgins, Tucker, and Jenai acted with malice.

333.    That Defendants Higgins, Tucker, and Jenai induced and caused Defendant Ramsay to terminate Plaintiff's employment and take other adverse action.

334.    That Defendant Higgins, Tucker, and Jenai's actions constitute tortious interference with a business relationship.

335.    That as a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered and will continue to suffer economic damages, including, but not limited to, lost wages, back pay, front pay, raises, bonuses, health, dental, vision, and/or life insurance benefits, short-term and/or long-term disability benefits, pension and/or retirement benefits, investment opportunities, employer contributions, and any other compensation and fringe benefits lost to Plaintiff as a result of Defendants' actions along with an additional amount to offset any negative tax consequences incurred as a result of recovery.

336.    That as a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered and will continue to suffer noneconomic damages, including, but not limited to, emotional distress, mental anguish, shock, fright, embarrassment, humiliation, nervousness, anxiety, depression, denial of social pleasures, and disruption of lifestyle.

337.    That Plaintiff hereby claims any and all costs, interest, and attorney fees permitted by Court Rule, statute, and/or common law.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment in her favor in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00) in addition to costs, interest, and attorney fees along with any and all legal and/or equitable relief this

Court deems just.

## COUNT IX – CIVIL CONSPIRACY AGAINST
## DEFENDANTS HIGGINS, TUCKER & JENAI

338.   That Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1 through 221 of her Common Allegations, paragraphs 222 through 247 of Count I, paragraphs 248 through 263 of Count II, paragraphs 264 through 281 of Count III, paragraphs 282 through 292 of Count IV, paragraphs 293 through 303 of Count V, paragraphs 304 through 314 of Count VI, paragraphs 315 through 325 of Count VII, and paragraphs 326 through 337 of Count VIII, word for word and paragraph for paragraph, as if fully restated herein.

339.   That at all times material hereto, Defendants Higgins, Tucker, and Jenai were involved with and entered into a conspiracy, which was self-labelled as "Project Mayhem."

340.   That Defendants planned and schemed to file various internal affairs complaints and falsely paint Plaintiff as a racist across various news outlets to discredit Plaintiff, to have her removed from the Treehouse Murder investigation, and, ultimately, to have her employment be terminated.

341.   That Defendants conspired to engage in unlawful acts and/or lawful acts by unlawful means to harm Plaintiff.

342.   That Defendants took overt acts in furtherance of the conspiracy, including making multiple internal affairs complaints and making false and defamatory statements online and to the media.

343.   That Plaintiff suffered damages as a result of the acts performed pursuant to the above conspiracy.

344.   That Defendants' actions constitute a civil conspiracy.

345.   That as a direct and proximate result of Defendants' unlawful actions, Plaintiff has

suffered and will continue to suffer economic damages, including, but not limited to, lost wages, back pay, front pay, raises, bonuses, health, dental, vision, and/or life insurance benefits, short-term and/or long-term disability benefits, pension and/or retirement benefits, investment opportunities, employer contributions, and any other compensation and fringe benefits lost to Plaintiff as a result of Defendants' actions along with an additional amount to offset any negative tax consequences incurred as a result of recovery.

346.    That as a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered and will continue to suffer noneconomic damages, including, but not limited to, emotional distress, mental anguish, shock, fright, embarrassment, humiliation, nervousness, anxiety, depression, denial of social pleasures, and disruption of lifestyle.

347.    That Plaintiff hereby claims any and all costs, interest, and attorney fees permitted by Court Rule, statute, and/or common law.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment in her favor in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00) in addition to costs, interest, and attorney fees along with any and all legal and/or equitable relief this Court deems just.

Respectfully submitted,
THE MASTROMARCO FIRM

Dated: <u>August 20, 2021</u>          By:    <u>*/s/ Victor J. Mastromarco, Jr.*</u>
VICTOR J. MASTROMARCO, JR. (P34564)
KEVIN J. KELLY (P74546)
Attorneys for Plaintiff
1024 N. Michigan Avenue
Saginaw, Michigan 48602
(989) 752-1414
vmastromarco@mastromarcofirm.com
kkelly@mastromarcofirm.com

*-and-*

J. SHEK LAW OFFICE

Dated: <u>August 20, 2021</u>          By:    */s/ John Shek* _____

JOHN SHEK (Florida Bar No. 122523)
Attorneys for Plaintiff
1700 66th Street N.
St. Petersburg, Florida 33710
(617) 723-1223
jsheklaw@gmail.com

## RELIANCE ON PRIOR DEMAND FOR TRIAL BY JURY

NOW COMES Plaintiff, PENNY PHELPS, by and through her attorneys, THE MASTROMARCO FIRM and the J. SHEK LAW OFFICE, and hereby relies on her prior demand for a trial by jury on all of the above issues, unless otherwise expressly waived.

Respectfully submitted,
THE MASTROMARCO FIRM

Dated: <u>August 20, 2021</u>          By:     <u>*/s/ Victor J. Mastromarco, Jr.*</u>
VICTOR J. MASTROMARCO, JR. (P34564)
KEVIN J. KELLY (P74546)
Attorneys for Plaintiff
1024 N. Michigan Avenue
Saginaw, Michigan 48602
(989) 752-1414
vmastromarco@mastromarcofirm.com
kkelly@mastromarcofirm.com

*-and-*

J. SHEK LAW OFFICE

Dated: <u>August 20, 2021</u>          By:     <u>*/s/ John Shek*</u>
JOHN SHEK (Florida Bar No. 122523)
Attorneys for Plaintiff
1700 66th Street N.
St. Petersburg, Florida 33710
(617) 723-1223
jsheklaw@gmail.com