UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

**Case Number: 21-10070-CIV-MARTINEZ-BECERRA**

PENNY PHELPS,

      Plaintiff,

v.

RICK RAMSAY *et al.*,

      Defendants.

_____/

## OMNIBUS ORDER ON MOTIONS FOR SUMMARY JUDGMENT

THIS CAUSE is before this Court upon Defendant Sheriff Rick Ramsay's ("Ramsay")

Motion for Summary Judgment ("Ramsay's Motion"), (ECF No. 111), and Defendants' Lauren

Jenai ("Jenai"), Franklin Tucker ("Tucker"), and Cara Higgins' ("Higgins"), (together "Individual

Defendants"), Motion for Summary Judgment ("JTH's Motion"), (ECF No. 115). This Court has

reviewed Ramsay's Motion, JTH's Motion, pertinent portions of the record, and applicable law

and is otherwise fully advised in the premises. Accordingly, and for the reasons set forth herein,

Ramsay's Motion is GRANTED, and JTH's Motion is GRANTED.

### I.   FACTUAL BACKGROUND

The following pertinent facts are undisputed unless otherwise noted. When the facts are in

dispute, they are taken in the light most favorable to the non-moving party, Plaintiff Captain Penny

Phelps ("Plaintiff"). *See Chapman v. Am. Cyanamid Co.*, 861 F.2d 1515, 1518 (11th Cir. 1988).

#### A.   *Facts Related to Plaintiff's Employment Discrimination Claim*

The Monroe County Sheriff's Office is a law enforcement agency, under the

command of Ramsay since 2012, which provides law enforcement services and

erates a correctional facility for Monroe County, Florida. (Joint Statement of Material Facts ("JSMF") ¶ 1, ECF No. 109.) Plaintiff was hired by the Monroe County Sheriff's Office on February 26, 2002. At the time of her hire, the Sheriff was Richard Roth. (*Id.* ¶ 2.) Upon her hire in 2002, at the rank of Captain, Plaintiff's first assignment was in the Bureau of Corrections. (*Id.* ¶ 3.) Initially, Plaintiff was the Operations Captain and was eventually moved to the Support Services Captain role. (*Id.* ¶ 4.) In that role, Plaintiff was tasked with supervising fifty or more subordinate officers. (*Id.*) Plaintiff's ancillary duties with the Bureau of Corrections included an assignment to the corrections accreditation division, professional standards, planning and research, and internal affairs. (*Id.*) Additionally, Plaintiff had responsibilities in the Training Division. (*Id.*)

At the time of Plaintiff's hire, now-Sheriff Ramsay was employed by the Monroe County Sheriff's Office in the rank of Captain and was overseeing the Bureau of Corrections. (*Id.* ¶ 5.) In approximately 2010, then-Sheriff Robert Peryam greatly reassigned Plaintiff's duties until she only remained in command of the Training Division, effectively reducing her span of control from about one-hundred-sixty-five people to three. (Ramsay's Statement of Material Facts ("RSMF") ¶ 6, ECF No. 110.) In 2003 or 2004, Ramsay became aware that Plaintiff was homosexual. (JSMF ¶ 5.) When Ramsay was elected Sheriff in 2012, he significantly advanced Plaintiff's position in the Sheriff's Office selecting Plaintiff to command the Support Services Division which included responsibility for supervision of the Communications Center, the Criminal Intelligence Division, the School Resource Officers, the Traffic Division, the Civil Deputies, the Bomb Team, the Dive Team, the Aviation Team, and the Crisis Negotiators. (*Id.* ¶ 6.) In this capacity, Plaintiff was tasked with supervising about one-third of the Law Enforcement Bureau for Ramsay. (*Id.*) Subsequently, in 2015-2016, Ramsay gave Plaintiff additional responsibility for overseeing the Major Crimes and Narcotics Units. (*Id.*) In 2018, Ramsay gave Plaintiff additional duties once

again, including responsibility for overseeing the High Intensity Drug Trafficking Area Team, and

the design and construction of the firearm range. (*Id.*)

In November 2017, Matthew Bonnett was murdered, and the case came to be colloquially

referred to as the Treehouse Murder. (*Id.* at ¶ 7.) On November 20, 2017, Plaintiff discussed

investigative strategy in the Criminal Investigation Office with other members of her Major Crimes

Unit, including Detective Pitcher, Deputy Malone, and Sergeant Kellenberger. (*Id.* ¶ 8.) The

purpose of the discussion was to devise a plan, in which Plaintiff came up with a ruse, (Pl.'s Resp.

RSMF ¶ 14, ECF No. 136), to obtain an identification for a suspect in the Treehouse murder, a

black man named Rory Wilson, then known as Detroit, (RSMF ¶ 12). Plaintiff's conversation was

captured on recording equipment in the interview room, which was located adjacent to the

Criminal Investigation Office. (JSMF ¶ 9.) During that discussion Plaintiff was recorded directing

Deputy Malone in relevant part:

> Just do this . . . hang out, make a traffic stop. If you do have a legitimate traffic
> stop, we'll have a road patrol deputy come over and meet you and you can write a
> ticket with road patrol deputy. I just need somebody that can be in the area Lee, and
> not leave, because I don't know when he's going to move or if he's going to move
> but I got to have a marked unit and the bearded dwarfs and David Smith have been
> told to keep you in their sights in case the traffic stop goes badly but to stay the hell
> away from the traffic stop because we don't want Detroit knowing that we know
> who the hell he is we want it to look like you the grumpy old man . . . you have
> nothing better to do than . . . you know, you're the white supremacist you're
> messing with the black guy riding the bike.

(RSMF ¶ 15.) Plaintiff continued, instructing Depute Malony, "there you go . . . I just want you

to be the neo-Nazi that's picking on the black guy riding the bike . . . get me a citizen's complaint

. . . give me a citizen's complaint if you have to." (*Id.*) Plaintiff does not dispute making these

statements and giving these instructions to Deputy Malone. (*Id.* ¶ 16.) This recording was

provided to the State Attorney's Office as part of the Treehouse Murder investigation. (*Id.* ¶ 17.)

Plaintiff does not dispute that approximately two years later, Higgins, who represented Tucker, a criminal defendant in the Treehouse Murder case, witnessed Plaintiff and about twenty other deputies in the courtroom during a public hearing held on October 3, 2019, related to the Treehouse Murder cases. (*Id.* ¶ 18.) However, Plaintiff adds that she and her colleagues attended the October 3, 2019, hearing at the request of Assistant State Attorney Colleen Dunne to show support for Detective Pitcher based on a miscommunication, not knowing that the hearing was merely a status conference and no testimony would be given. (Pl.'s Resp. RSMF ¶ 18.) Following the October 3, 2019 hearing, Higgins complained via email to the Sheriff's Office regarding the presence of the deputies in the courtroom. (RSMF ¶ 19; Pl.'s Resp. RSMF ¶ 19.) On October 4, 2019, Colonel Caputo wrote a memo to Plaintiff and apprised Plaintiff and Ramsay that he had concerns regarding Plaintiff's involvement in the pending Treehouse Murder cases against John Johnson, Rory Wilson, and Tucker and would be transferring supervision of those cases to Major Chad Scilibilia. (RSMF ¶ 20–21; Pl.'s Resp. RSMF ¶ 20.) The parties dispute whether Colonel Caputo's memo was connected to the internal affairs investigation initiated in response to Higgins' complaint. (*Id.*) The parties also dispute whether it was unlawful for General Counsel McCullah to provide Higgins with a copy of the October 4, 2019, Caputo Memo. (RSMF ¶ 59; Pl.'s Resp. RSMF ¶ 59.)

Shortly after, in late October 2019, Higgins and Tucker made several complaints to the Sheriff's Office Internal Affairs unit concerning Plaintiff's conduct during the Treehouse Murder investigation, including the statements Plaintiff made on the November 20, 2017, recording, which Higgins received during discovery from the Monroe County State Attorney's Office in the State of Florida v. Franklin Tyrone Tucker Litigation. (RSMF ¶ 22; Reply Pl.'s Resp. RSMF ¶ 22, ECF No. 141.) Although Plaintiff disputes whether Higgins personally considered her email a "formal

complaint," it remains undisputed that Higgins raised concerns with the Sheriff's Office via her October 3rd email, which prompted the initiation of internal affairs investigation case number IA-2019-046. (RSMF ¶ 24; Reply Pl.'s Resp. RSMF ¶ 22.) Plaintiff was served with the notice of investigation in IA-2019-046 on November 14, 2019. (JSMF ¶ 14.) Inspector General Lee Ann Holroyd, who was in command of internal affairs, assigned IA-2019-046 to Inspector Michelle Maxwell. (*Id.* ¶ 15.)

In January 2019, Major Scibilia conducted an audit of the open cases being handled by Plaintiff's Major Crimes Unit and met with Plaintiff to go through those cases. (RSMF ¶ 28.) Major Scilibia directed Plaintiff to work with the new sergeant to clean up the open cases. (*Id.*) Plaintiff stated that, "[w]e had gone through three sergeants and he ran an audit report. He had outlined the cases that he wanted addressed [and] we changed some of the procedures that were going on in major crimes to address the Major's concerns." (*Id.*) Plaintiff disputes that she failed to take action with respect to the cases in her unit or that her performance was deficient in any manner. (Pl.'s Resp. RSMF ¶ 28.) According to Ramsay, Major Scilibia conducted another audit on November 13, 2019, on all active cases in the Major Crimes Unit which revealed that thirteen of a total fifty-five cases again fell short of Plaintiff and the Sheriff's Office's expectation of professional, thorough, and timely investigation. (RSMF ¶ 30.) Plaintiff asserts that there had been no discussion of any issues between January 2019 and November 19, 2019, (Pl.'s Resp. RSMF ¶¶ 28–30), and disputes that Major Scilibia had actual concerns about her command of the Major Crimes Unit, (*id.* ¶ 31), despite admitting as much in her own testimony, saying that Major Scilibia's "primary concern was that a lot of cases had not been properly closed, they were remaining open without any status," that "[h]e addressed a variety of concerns in January 2019," and that "[t]he state attorney's office was not getting proper notifications so there was a variety of

things that he discussed in January '19 and we put a system in place to address his concerns." (RSMF ¶ 29.)  Plaintiff and Ramsay also dispute whether Major Scilibia's audits of Plaintiff's Major Crimes Unit was in any way connected with the separate internal investigation IA-2019-046, which involved Plaintiff's instructions to Deputy Malone to act like a neo-Nazi, white supremacist while investigating a black suspect in the Treehouse Murder cases.  (RSMF ¶ 32; Pl.'s Resp. RSMF ¶ 31.)  On November 19, 2019, Plaintiff met with Colonel Caputo and Major Scilibia during which, Major Scilibia told Plaintiff that he was going to recommend that she be removed from command of the Special Investigation Division, including the Major Crimes and Narcotics Units.  (JSMF ¶ 23.)  Colonel Caputo testified that the November 19, 2019, "meeting was strictly about removing [Plaintiff] from command of the Major Crimes unit" and that it "had nothing to do with any other Internal Affairs investigation, it was strictly isolated to her being commander of that unit."  (RSMF ¶ 32.)  Major Scilibia also testified that, "[a]t that point, I had not received, or read, or reviewed the Internal Affairs investigation [IA-2019-046]."  (*Id.*)  In response to Colonel Caputo and Major Scilibia's testimony, Plaintiff characterizes the timing of the internal affairs complaints as "suspicious."  (Pl.'s Resp. RSMF ¶ 31.)  On November 22, 2019, Major Scilibia authored a memo to Colonel Caputo formally requesting that Plaintiff be removed from command of the Major Crimes Unit.  (RSMF ¶ 33; JSMF ¶ 24.)  On December 4, 2019, Colonel Caputo authored a memo to Plaintiff informing her that he was transferring command of the Major Crimes and Narcotics Units (Special Operations) to Director Patricia Thompson, a homosexual female officer.  (JSMF ¶ 24; RSMF ¶ 34.)

Shortly thereafter, internal affairs investigation IA-2019-046 concluded on December 13, 2019, resulting in Plaintiff's termination, effective on December 19, 2019.  (RSMF ¶ 35; Ramsay Exhibit ("R. Ex.") 7 ¶ 14, ECF No. 108-7.).

From Plaintiff's perspective, Ramsay did not sincerely believe she did anything wrong largely based on a November 14, 2019, text message saying:

> On another note, please do not stress too much over the complaint. I know that it is hard, but we have to look into a complaint by Ms. Higgins. Not nice things were said by the Blue Paper and Higgins. We support you and hope to clear your name! Stress after if you believe that you have to at that time. sorry :(

(Pl.'s Resp. RMSF ¶¶ 48, 63). Plaintiff further testified that she "was repeatedly told by Caputo and Scibilia that I was not being demoted and I was not being fired. Patrick McCullah assured me that I was not being demoted, that I was not being fired. Those have never been topics of conversations, that it wasn't about that. Caputo told me, stop stressing over the complaints." (*Id.* ¶ 64.)   Additionally, despite the September 15, 2019, letter from Tucker lodging several complaints against Plaintiff, Higgin's October 3, 2019, email, and the October 4, 2019, memo from Colonel Caputo, on October 1, 2019, Plaintiff received her 2019 Merit Increase. (*Id.* ¶ 58.) Defendant disputes Plaintiff's characterization of these facts noting that the November 14, 2019, text message was sent about a month before the investigation was complete and before the full consequences of Plaintiff's actions became apparent. (Reply Pl.'s Resp. ¶ 63.) Defendant adds that, in proper context, it is evident that the statements from Colonel Caputo and Major Scilibia were in connection with removing Plaintiff as Commander of the Major Crimes Unit, and not in connection with her later discharge as a result of the neo-Nazi, white supremacist comments. (*Id.* ¶ 64.)

The Sheriff's Office decided not to interview Plaintiff as part of the investigation and on November 20, 2019, Captain Holroyd emailed her subordinates indicating that Colonel Caputo has stressed the need to "push forward as quickly as possible on our open cases related to the Treehouse murder." (Pl.'s Resp. ¶ 36; Plaintiff's Exhibit ("Pl.'s Ex.") 14, ECF No. 136-14.) The Internal Affairs Unit did not complete the investigation of IA-2019-046 within thirty days and failed to

request an extension of time. (Pl.'s Resp. RSMF ¶ 36.) It is disputed whether Ramsay's General Orders require such an extension. (Reply Pl.'s Resp. RSMF ¶ 68.) Plaintiff suggests the decision not to interview her and the fact that it was not completed within 30-days casts a shadow on the investigation. (Pl.'s Resp. RSMF ¶¶ 36, 68.) Plaintiff also disputes that Major Scilibia, Colonel Caputo, and Ramsay made independent reviews of IA-2019-046. (*Id.* ¶¶ 37–39.) Plaintiff asserts IA-2019-046 was conjured up by Ramsay, Major Scilibia, Colonel Caputo, Captain Holroyd, General Counsel Patrick McCullah and Public Information Officer Adam Lindhart, who all worked in concert to have her fired. (*Id.* ¶ 37.)

In Plaintiff's view, this concerted action was a result of continued pressure from Higgins. (*Id.* ¶ 65.) On November 18, 2019, Higgins sent a cease-and-desist letter to Ramsay, threatening a lawsuit and requesting he not make any statements that Tucker committed a crime. (*Id.*) On December 11, 2019, Inspector Maxwell wrote to Mr. McCullah saying "[s]poke to cara-she wants a meeting with me, you and the sheriff. She wants the 4 of us to sit down. Let me know how to respond." (*Id.* ¶ 66.) Mr. McCullah responded, "Let's talk in the morning on this one." (*Id.*) Throughout December 2019, Higgins, Tucker, and Jenai made various public statements encouraging Plaintiff's removal from office. (*Id.* ¶ 67.) On December 13, 2019, Ramsay told Plaintiff "I am unable to allow you to return to your post" and on December 18, 2019, Ramsay appeared on "The Morning Magazine" radio show and said that the "Sheriff's Office does not tolerate these types of comments. I just cannot defend this." (*Id.* ¶ 49.)

Finally, Plaintiff points out that while she was recorded making the statements in question, numerous Sheriff's Office employees were willing to participate in the ruse, including all those individuals present, Deputy Malone, and Sergeant Llera; and no one else who agreed to participate was investigated or disciplined. (*Id.* ¶ 47.) Plaintiff was afforded the opportunity and did submit

statements which were read at her predetermination hearing, contesting her dismissal in which, Plaintiff maintained that there is nothing wrong, immoral, racist, or inappropriate about her proposed ruse. (*Id.* ¶¶ 52, 79)

According to Ramsay, Inspector General Holroyd determined the scope of the investigation would be to identify the people on the November 20, 2017, recording and verify evidence. (RSMF ¶ 26.) Plaintiff admits to directing Deputy Malone to act like a neo-Nazi white supremacist and that she chose to use negative race-based stereotypes. (*Id.* ¶ 47.) Upon receipt of the investigative file, each of Major Scilibia, Colonel Caputo, and Sheriff Ramsay made independent reviews of the IA-2019-046 case file. (*Id.* ¶¶ 37–39.)

On December 12, 2019, only one day before the IA-2019-046 investigation was completed, the President of the South Florida PBA, a labor union that represents nearly all deputies employed at the Sheriff's Office, sent a letter to Sheriff Ramsay stating he believed that, based on the allegations against Plaintiff, "our members, and your employees as a whole, even those we do not represent, be entitled to a workplace free of [Plaintiff's] oversight in any capacity, including training." (*Id.* ¶ 41.)[1] During that same time, the Sheriff's Office received a communication from Leadership Monroe County informing the Sheriff that because of the controversy surrounding Plaintiff's statements, they no longer wanted her to give a presentation at their upcoming session.

---

[1] Plaintiff does not actually dispute paragraphs 41–43. Instead, Plaintiff objects to the consideration of a hearsay letter and hearsay testimony by a non-party. Accordingly, this Court will treat these paragraphs as undisputed. Plaintiff's objections are misguided. First, this Court may consider hearsay evidence during summary judgment if it is reducible to admissible form at trial. *See Macuba v. Deboer*, 193 F.3d 1316, 1324–25 (11th Cir. 1999). Second "an out-of-court statement admitted to show its effect on the hearer is not hearsay." *United States v. Rivera*, 780 F.3d 1084, 1092 (11th Cir. 2015). The statements made in paragraphs 41–43 are reducible to admissible form by calling the declarants as witnesses during trial. However, even if this were not the case, paragraphs 41–43 are not hearsay at all as those statements may be admitted to show their effect on Ramsay in making his decision to terminate Plaintiff.

the College of the Florida Keys advised the Sheriff's Office that the College's president, Dr. Jonathan Guevarra, a black man, had revoked Plaintiff's adjunct teaching privileges and banished her from teaching at the College campus due to her racially charged statements. (*Id.* ¶ 43.) The Sheriff's Director of Human Resources, a black woman, openly wept at the Sheriff's weekly staff meeting while describing feedback she had received in the community regarding Plaintiff's statements. (*Id.*)  What's more, it is undisputed that in early December 2019, Plaintiff's use of racially charged instructions to a subordinate was making local, state, national, and international news, which was being brought to the attention of the Sheriff's Office by third parties. (*Id.* ¶ 44.)

> Ramsay testified that, in his opinion,

> [t]his particular case was a bad call, bad decision, was not needed. It put the officer, Malone, in a terrible situation. It put the agency in a terrible situation. It went out to hurt this agency. There was no need for this and this component was not part of the [ruse]. The [ruse] was the traffic stop to identify the person to get his ID, his thumbprint. The other component I do not know why it was put in there, but it was not needed, not justified and would have – not have been authorized.

(*Id.* ¶ 48.)  During a meeting held after the pre-determination hearing, Ramsay asked Colonel Caputo and Major Scilibia if anything that Plaintiff said during the hearing changed their minds regarding their recommendations for termination, and they answered that it did not. (*Id.* ¶ 49.) Weighing Plaintiff's conduct, the impact on the community and abroad, the concerns raised by the PBA, the college, and Leadership Monroe, together with the impact on the agency, Ramsay made his final decision to terminate Plaintiff. (*Id.*)  Nothing in Plaintiff's letter read during the pre-determination hearing accuses Ramsay or anyone else of discrimination on the basis of her sex and/or sexual orientation. (*Id.* ¶ 46.)  Finally, Plaintiff certified in writing each year, "I have not been the subject of discrimination or harassment in the MCSO workplace." (Reply Pl.'s Resp. RSMF ¶¶ 73–74.)

Nevertheless, Plaintiff claims that Ramsay fostered an environment where there was proclivity to subjugate women.    (Pl.'s Resp. RSMF ¶ 70.)    First, Plaintiff claims Ramsay responded angrily to questions regarding his sexual orientation which arose at a Florida Law Enforcement Gays and Lesbians Conference. (*Id.* ¶ 71.) Plaintiff also notes that she has repeatedly complained to Mr. McCullah and Major Scilibia that Ramsay uses the term "lawmen," and that Ramsay has referred to female command officers as "Miss" as opposed to their rank. (*Id.* ¶¶ 72–73.) According to Plaintiff, Ramsay has tolerated explicitly discriminatory comments pointing to an instance where, when Ramsay was the Colonel, Sergeant Lopez was disciplined after he referred to Plaintiff as "my dumb cunt captain" in front of a room full of recruits. (*Id.* ¶ 74.)   On another occasion, a male deputy, Nick Whiteman, touched a female deputy's breast while in the presence of a sergeant without receiving discipline. (*Id.* ¶ 75.)  Moreover, on July 21, 2017, Ramsay appeared in a photograph in the Key West Weekly acting as a male dominating scantily clad women on stage at the request of Michelle Maxwell, who entered a contest to put on a skit during an annual charity fundraiser for battered women and children. (Reply Pl.'s Resp. RSMF ¶ 78; Pl.'s Resp. RSMF ¶ 78).

Ramsay disputes Plaintiff's characterization of these incidents explaining that he never became angry when questioned about his sexual orientation, (Reply Pl.'s Resp. RSMF ¶ 71), that he likewise refers to male officers as "Sir," (*Id.* ¶ 73), and that there is no record evidence he was aware of the 2003–2004 statement from Sergeant Lopez, let alone that he tolerated it, nor was he the Sheriff at the time, (*Id.* ¶ 74).  Furthermore, regarding the incident with Deputy Whiteman, Ramsay asserts that the matter did not come to the level of the Sheriff but was handled by a lower level of management in a manner acceptable to the complainant. (*Id.* ¶ 75.)

Lastly, according to Plaintiff, there are several instances in which her heterosexual male counterparts were given preferential treatment with respect to disciplinary proceedings and internal investigations. In 2017, a heterosexual male, Sergeant David Lariz, was involved in a series of traffic stops that also received publicity. (Pl.'s Resp. RSMF ¶ 69.) The first incident involved a hit and run accident where Sergeant Lariz asked an injured bicyclist if he was in the country legally. (*Id.*; Reply Pl.'s Resp. RSMF ¶ 69.) In the second incident, Sergeant Lariz pulled over a car driving in the wrong lane and when presented with an Argentinian driver's license, he again asked if the driver was in the country legally. (Reply Pl.'s Resp. RSMF ¶ 69.) Plaintiff adds that Sergeant Lariz yelled at the individual for not having the proper paperwork. (Pl.'s Resp. RSMF ¶ 69.) It is disputed whether Sergeant Lariz engaged in racially profiling Latino males. (Pl.'s Resp. RSMF ¶ 69; Reply Pl.'s Resp. RSMF ¶ 69.) Sergeant Lariz was not investigated by Internal Affairs, disciplined, suspended, or fired. (Pl.'s Resp. RSMF ¶ 69.) These incidents involved a lower-level deputy and were not handled by Ramsay. (Reply Pl.'s Resp. RSMF ¶ 69.) On another occasion, Lieutenant James Norman admitted to instructing Detective Danielle Malone to access emergency contact information from the Driver and Vehicle Identification database. (Pl.'s Resp. RSMF ¶ 76.) Detective Malone, the female officer, was subject to an internal affairs investigation and received discipline, whereas Lieutenant Norman experienced neither. (*Id.*) Ramsay explains that Lieutenant Norman retired on October 31, 2019, before this issue arose and concluded. (Reply Pl.'s Resp. RSMF ¶ 76.) Moreover, Plaintiff supervised Lieutenant Norman and would have been able to initiate disciplinary proceedings but did not. (*Id.*) In another example, Plaintiff was subject to an investigation related to the mishandling of evidence by members of the Major Crimes Unit; however, the two heterosexual males that oversaw the day-to-day operations were not likewise investigated. (Pl.'s Resp. RSMF ¶ 77.) Ramsay does not dispute the two male officers were not

subject to investigation or discipline but clarifies that Plaintiff was their supervisor and again chose not to initiate disciplinary proceedings.  (Reply Pl.'s Resp. RSMF ¶ 77.)  Additionally, Plaintiff admits she was not disciplined or discharged for anything related to the mishandling of evidence. (*Id.*)

### B. *Facts Related to Plaintiff's Defamation and Civil Conspiracy Claims*

Tucker was arrested and charged with participating in the Treehouse Murder case, (JTH SMF ¶ 11, ECF No. 113), and Higgins was retained to represent him, (*Id.* ¶ 12).  Jenai was Tucker's girlfriend and eventually became his wife.  (*Id.* ¶ 15.)  It is undisputed that Jenai, Higgins, and Tucker made the following public statements discussed below during the course of the Treehouse Murder investigation related to the controversy that followed the release of the November 20, 2017, recording of Plaintiff instructing Deputy Malone to act like a neo-Nazi, white supremacist while stopping an African American suspect to obtain an ID.

#### a.   *Jenai's alleged defamatory statements*

First, on October 19, 2019, the NEW Key West Paper, also known as The Blue Paper published the following statement:

> "I looked into the case", says Lauren. "The reports said Ty was on surveillance video - he was not. The reports said a lot of things that ended up not being true. And when I saw there was absolutely no credible evidence against him, I became 100% sure of his innocence"

(*Id.* ¶ 52.)

Second, the New York Times published the following statement:

> I think the bigger story here is really about a very corrupt police department and prosecutor's office in a very small town. Basically, they've been getting away with this kind of thing for years, because mostly they're picking on poor people and homeless people, and they count on the fact that nobody's going to come and look into what they're doing.

(*Id.* ¶ 53.)

The third and final statement attributed to Jenai appeared in the New York Post on November 23, 2020: "What if somebody framed me for murder and there was nobody to help?" (*Id.* ¶ 55.)

         **b.** *Higgins' alleged defamatory statements*

First, on December 7, 2019, Higgins made the following Facebook Post:

> "I want you to be the neo-Nazi picking on the black guy on the bike." This is how a Captain at the MCSO directs her subordinates to act. Like neo-Nazis. A prosecutor who lies and hides evidence. A racist cop who thinks she is above the law. Why do they STILL have jobs?

(*Id.* ¶ 56.)

Second, on December 9, 2019, the Washington Post published an article titled, "Deputy told to act like a 'white supremacist' when stopping black murder suspect," which quoted Higgins saying, "[a]nyone who uses those words has no place in that department at that level." (*Id.* ¶ 59.)

Third, on December 11, 2019, during an interview with US 1 Radio, Higgins stated:

> I heard the Sheriff say that he is not going to make a determination on whether or not to terminate Captain Phelps based on one complaint. Captain Phelps has an IA file that is over 600 pages long. She does not have an exemplary record and she has had at least one prior complaint for race discrimination. It was several years ago at the Sheriff's department. The Sheriff's Internal Affairs division found that it was unfounded, but for the Sheriff to say that this was based on one complaint about Penny Phelp's behavior is simply outrageous.

(*Id.* ¶ 60.)  Finally, in that same interview Higgins also stated:

> We don't feel that she had any probable cause whatsoever. What Penny Phelps did was botch this investigation. She created a story in her mind and manufactured the evidence to fit her narrative. The actions of Penny Phelps, in my opinion, are criminal. And, for this to be taken lightly and suggested that it's just one complaint over a poor choice of words is really despicable.

(*Id.* ¶ 61.)

      **c.** *Tucker's alleged defamatory statements*

On December 7, 2019, Tucker made three Facebook posts: first, he posted "I'm happy she's finally being outed and yeah the racist set up is bad but setting someone up for murder is so much worse," (*Id.* ¶ 62); second, he posted "[w]hile they did release the audio of her racist bullshit, they seem to have left out the parts where she was setting me up," (*Id.* ¶ 63); and third he posted "[o]ne of the things she's in trouble for is telling a deputy to play a neo-Nazi, racist cop to illegally pull Rory over on his bike," (*Id.* ¶ 64).

On December 11, 2019, Tucker posted on Facebook:

> My only real criticism is one of the expert who says her actions were 'probably legal'. While the acting like a racist may be legal, telling the officer to pull him over for some imagined infraction, is not. Once again, this is the least of what Captain Phelps did wrong in this case but hopefully this topic will shed light on her many other acts of misconduct, namely framing me for murder.

(*Id.* ¶ 65). On December 13, 2019, Tucker posted on Facebook: "I'd love to see her not only fired but charged criminally for setting me up." (*Id.* ¶ 66.) And again, on December 14, 2019, Tucker posted on Facebook: "[h]opefully, she'll be charged criminally for the shit she did to me!!" (*Id.* ¶ 67.)

On December 20, 2019, during a ten-minute interview on the Sean Hannity radio program with Jonathan Gilliam hosting, Tucker discussed how he was arrested for being white and living in the same building with a suspect, as well as how video had been manipulated. (*Id.* ¶¶ 68–69.) Tucker then notes that Plaintiff is recorded interviewing Rory Wilson and then the video cuts out before returning with three minutes missing. (*Id.* ¶ 70.) He further notes that he made an internal affairs complaint against Plaintiff, and others, and mentions that Plaintiff got in trouble for "racially motivated comments," and that she directed officers to make illegal stops in reference to

her instruction for Deputy Malone to act like a neo-Nazi, white supremacist.  (*Id.* ¶ 71.)  He also confirmed that Plaintiff had been terminated.  (*Id.*)

On November 23, 2020, Tucker was interviewed along with Jenai and wore a shirt that had "Not Guilty" printed on it.  (*Id.* ¶ 73.)  During the interview Tucker said, "[i]f we declared ready for trial today, there is no way the prosecution would be ready.  They don't have a case."  (*Id.*)

### d. *"Project Mayhem"*

At the outset this Court notes that the Individual Defendants dispute all facts pertaining to Project Mayhem and Plaintiffs Civil conspiracy claim.  According to Plaintiff, in the summer of 2019, Tucker and Jenai began discussing "Project Mayhem," the codename for a planned operation to file various internal affairs complaints against plaintiff, bar complaints against the prosecutor, and raise media attention to discredit Plaintiff, the investigators, and the prosecutor, who would presumably have to admit to being subject to an internal affairs investigation.  (Pl.'s Resp. JTH SMF ¶ 74.)  The alleged overarching objective was to have them removed from the case against Tucker.  (*Id.*)  Plaintiff then claims that "Project Mayhem" comes from the novel "Fight Club," which Tucker was reading at the time and provided the motivation for an elaborate scheme to defame Plaintiff, interfere with the Treehouse Murder investigation, and improperly influence public opinion.  (*Id.* ¶ 75.)

As evidence, Plaintiff points to a number of phone recordings between Tucker and Jenai. According to Plaintiff, the contents of the recordings are as follows:

- The June 22, 2019, recording: Defendant Tucker discussed Defendant Jenai posting depositions online and a motion filed by Tucker's criminal attorney; he also indicated that there should be another round of news articles coming out.

- The July 30, 2019, recording: Defendants Tucker and Jenai discussed submitting letters to the Internal Affairs Unit and intimate that it will look back [sic] for the Sheriff's Office, suggesting that if Internal Affairs investigates, they'll have to admit they are under

investigation, and if Internal Affairs does not investigation, they'll look like they are doing bad things.

- Also on July 30, 2019, Defendants Tucker and Jenai discuss Jenai putting things up on Facebook. Defendant Tucker also states that he will have his letter finished for Defendant Higgins the following day

- The August 20, 2019, recording: On August 20, 2019, Defendants Tucker and Jenai specifically discuss "Project Mayhem." Defendant Tucker states he may have to put "Project Mayhem" on hold or alter his planes [sic]. Defendant Tucker explains to Defendant Jenai that there are certain things that the attorneys will do and there are other things that he and Defendant Jenai will do. He states he will have the attorneys look at thing things [sic] he does to make sure he does not do anything illegal or stupid. He subsequently indicates that Project Mayhem is underway, and he has been in contact with Defendant Higgins's office.

- The August 27, 2019, recording: Defendant Tucker told Defendant Jenai that he had told Defendant Higgins about Project Mayhem and Defendant Higgins did not try to talk him out of it. He subsequently notes that "everybody's on board with Project Mayhem."

(*Id.* ¶ 76.)

Plaintiff then summarily asserts that the various internal affairs complaints that the Individual Defendants filed with the Sheriff's Office were baseless, which proves they were in furtherance of "Project Mayhem." (*Id.* ¶¶ 77–82.)

## II.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a court must grant summary judgment if the "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , or other materials," Fed. R. Civ. P. 56(c), ". . . show . . . that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). "The moving party bears the initial burden to show the district court, . . . by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *accord Kol B'Seder, Inc. v. Certain Underwriters at Lloyd's of London Subscribing to Certificate No. 154766 Under Cont. No.*

*B0621MASRSWV15BND*, 766 F. App'x 795, 798 (11th Cir. 2019). "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark*, 929 F.2d at 608.

When the moving party has carried its burden, the party opposing summary judgment must do more than show that there is "metaphysical doubt" as to any material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Indeed, Rule 56 "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (cleaned up); *Kol B'Seder*, 766 F. App'x at 798. While non-conclusory, self-serving affidavits based on personal knowledge could create genuine disputes of material fact, conclusory affidavits do not defeat summary judgment. *United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018); *Rodda v. Univ. of Mia.*, 542 F. Supp. 3d 1289, 1295 (S.D. Fla. 2021). "[C]onclusory allegations without specific supporting facts have no probative value." *Myers v. Bowman*, 713 F.3d 1319, 1327 (11th Cir. 2013) (citing *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985)).

At summary judgment, this Court must view the evidence and draw inferences in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus.*, 475 U.S. at 587–58; *Chapman*, 861 F.2d at 1518. "All reasonable inferences arising from the undisputed facts should be made in favor of the nonmovant." *Chapman*, 861 F.2d at 1518. "However, an inference based on speculation and conjecture is not reasonable." *Id.* (citing *Blackston v. Shook & Fletcher Insulation Co.*, 764 F.2d 1480, 1482 (11th Cir. 1985)). "Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005). "Where the record

taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *See Matsushita Elec. Indus.*, 475 U.S. at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968). Where the court ruling on summary judgment will be the trier of fact in a bench trial and there are "'no issues of witness credibility,' the Court may make factual determinations and draw inferences at the summary judgment stage based on the affidavits, depositions and other evidence in the record, because '[a] trial on the merits would reveal no additional data' nor 'aid the determination.'" *Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1251 (11th Cir. 2016) (alteration in original) (citing *Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ.*, 91 F. Supp. 3d 1265, 1273 (S.D. Fla. 2015); and then citing *Nunez v. Superior Oil Co.*, 572 F.2d 1119, 1123–24 (5th Cir. 1978)); *see also United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002) ("Credibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses.").

## III.   DISCUSSION

### A. *Ramsay's Arguments*

Ramsay argues that (1) Plaintiff lacks direct evidence of discrimination; (2) Plaintiff cannot establish a prima facie case of sex and/or sexual orientation discrimination as she failed to identify any comparators; (3) even were Plaintiff to establish a prima facie case of sexual orientation discrimination, Ramsay had a legitimate, non-discriminatory reason for Plaintiff's termination; and (4) Plaintiff failed to establish that the alleged adverse employment action against Plaintiff was pretextual; and (5) that Ramsay is entitled to Qualified immunity.  (*See generally* Ramsay Mot. Summ. J., ECF No. 111.)

### 1.   RAMSAY CANNOT BE HELD LIABLE FOR SEX AND/OR SEXUAL ORIENTATION DISCRIMINATION

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."   42 U.S.C. § 2000e–2(a)(1).   An employer violates Title VII if it discriminates against an employee based on that individual's sexual orientation.  *See Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1754 (2020) ("An employer who fires an individual merely for being gay or transgender defies the law.").  As the Court in *Bostock* made clear, "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Id.* at 1741. "[T]o prove discriminatory treatment in violation of Title VII, a plaintiff must first establish a prima facie case of discrimination."  *Coutu v. Martin Cnty. Bd. of Cnty. Comm'rs*, 47 F.3d 1068, 1073 (11th Cir. 1995).  In showing that his employers discriminated against him, Plaintiff "may rely on direct or circumstantial evidence of discrimination."  *See Maynard v. Bd. of Regents*, 342 F.3d 1281, 1288–89 (11th Cir. 2003) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 526 (1993)).  "Title VII and § 1983 claims have the same elements where the claims are based on the same set of facts, and in such cases, the claims are subject to the same legal analysis."  *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016) (internal quotations omitted).

Here, Plaintiff uses only circumstantial evidence under the *McDonnell Douglas* framework to support her claim of sex and sexual orientation discrimination.  Alternatively, Plaintiff also asserts that she has put forth sufficient evidence to establish either a convincing mosaic of discrimination, or discrimination under a mixed-motive analysis to survive summary judgment. This Court will address each theory in turn.

**a.  Plaintiff Failed to Make a Prima Facie Showing of Discrimination**

For Plaintiff to prevail under Title VII based on circumstantial evidence, Plaintiff must show that: "(1) [s]he is a member of a protected class; (2) [s]he was qualified for the position; (3) [s]he suffered an adverse employment action; and (4) [s]he was replaced by a person outside [her] protected class or was treated less favorably than a similarly-situated individual outside [her] protected class." *See Maynard*, 342 F.3d at 1289 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). If a plaintiff establishes a prima facie case, the employer can "rebut this inference [of discriminatory intent] by 'clearly articulating in a reasonably specific manner a legitimate non-discriminatory reason' for the adverse action." *Coutu*, 47 F.3d at 1073. If the employer rebuts the inference, "the plaintiff then has the burden of persuading the court that the proffered reason is a pretext for the true discriminatory reason." *Id.* "A plaintiff does not shift the burden to the defendant under *McDonnell Douglas* merely by stating that he was fired or treated unfavorably." *Morris v. Emory Clinic, Inc.*, 402 F.3d 1076, 1082 (11th Cir. 2005).

Here, there is no genuine dispute that Plaintiff satisfies the first three prongs of the *McDonnell Douglas* test: (1) Plaintiff is a homosexual woman; (2) Plaintiff is a police officer who is "qualified" in all pertinent respects to have worked for the Sheriff's Office as at the rank of Captain; and (3) the parties also assume for the purposes of summary judgment that Plaintiff's termination was an adverse employment action. As to the fourth prong, however, Defendants argue that Plaintiff cannot make a prima facie showing of discrimination because she failed to show that she was treated less favorably than similarly situated employees outside her protected class.

The fourth and final prong of the *McDonnell Douglas* test requires that Plaintiff identify "an individual who replaced [her that] was treated better than [s]he was [and] who was not a member of [her] protected class . . . ." *See Morris*, 402 F.3d at 1082 (citing *Hawkins v. Ceco*

*Corp.*, 883 F.2d 977, 982 (11th Cir. 1989)).  When evaluating a replacement, the Eleventh Circuit

has stated that "[w]here the employee's position is clearly delineated and responsibilities are well

defined, the court should focus on the person that physically replaced the employee or consider

whether that job title was actually filled." *Id.* (citing *Hawkins*, 883 F.2d at 982). The "comparator,"

the preferentially treated individual from outside the plaintiff's protected class, must be similarly

situation to the plaintiff in all "material respects." *Lewis v. City of Union City*, 918 F.3d 1213,

1229 (11th Cir. 2019) (en banc).  "Absent a qualitative comparison at the prima facie stage—*i.e.*,

without determining whether the employer treated like cases differently—there's no way of

knowing (or even inferring) that discrimination is afoot." *Id.* at 1223 (emphasis removed).  In

determining whether a comparator is similarly situated, the Eleventh Circuit has outlined certain

considerations this Court should consider:

> [A] similarly situated comparator—
> - will have engaged in the same basic conduct (or misconduct) as the plaintiff . . . ;
> - will have been subject to the same employment policy, guideline, or rule as the plaintiff . . . ;
> - will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff . . . ;
> - will share the plaintiff's employment or disciplinary history . . . .

*Id.* at 1227–28 (citations omitted) (first citing *Michell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir.

1992); then citing *Lathem v. Dep't of Child. & Youth Servs.*, 172 F.3d 786, 793 (11th Cir. 1999);

then citing *Jones v. Gerwens*, 874 F.2d 1534, 1541 (11th Cir. 1989); and then citing *Tennial v.

United Parcel Serv., Inc.*, 840 F.3d 292, 304 (6th Cir. 2016)).  "An employer is well within its

rights to accord different treatment to employees who are differently situated in 'material

respects'—*e.g.*, who engaged in different conduct, who were subject to different policies, or who

have different work histories." *Id.* at 1228.

Plaintiff primarily relies on Sergeant David Lariz as the only comparator in this case.  (Pl.'s Resp. Mot. Summ. J. at 4, ECF No. 120.)  Plaintiff argues that (1) both were accused of making racially charged statements that received significant media attention, (2) both were subject to the same policies and procedures, and (3) both ultimately reported to the same decisionmaker, Ramsay, who makes the final decision on terminations.  (*Id.*)  What's more, Plaintiff emphasizes that while her conduct did not involve any real racism, but merely an instruction to pretend to be racist, Sergeant Lariz engaged in actual racial profiling of Latino males, yet Sergeant Lariz was not suspended or terminated.  (*Id.*)

Sergeant Lariz is not an appropriate comparator.  First, there are material differences in Sergeant Lariz and Plaintiff's rank and job responsibilities.  Sergeant Lariz was a line level supervisor, not a command officer.  By contrast, Plaintiff held a high-ranking, public-facing position and was responsible for leading investigations, managing entire units, training for the entire agency, and representing and speaking for the Sheriff's Office publically.  "It cannot be said that conduct that might be tolerated or treated with progressive discipline at lower ranks must be similarly accepted from" high ranking officials "who are held to a higher level of professionalism and who are expected to set the standard of conduct for the department."  *See Rioux v. City of Atlanta*, 520 F.3d 1269, 1281 (11th Cir. 2008) (determining proposed comparator was invalid partly based on "material differences in the men's respective ranks and job responsibilities.").

Relatedly, Sergeant Lariz's basic conduct differed materially from Plaintiff's.  Sergeant Lariz merely asked for immigration documentation, albeit mistakenly, during two traffic stops. Nothing in the record suggests he had any prior knowledge of the race or identity of the individuals involved.  In fact, it is undisputed that during one of the traffic stops, Sergeant Lariz was presented with an Argentinian driver's license.  Notably, Sergeant Lariz was never accused of racial

profiling, or any race-based misconduct, and no complaints were filed. By contrast, as part of her "ruse," Plaintiff used her authority as a high-ranking officer to direct a subordinate to act like a white supremacist and harass a suspect whom she knew was African American to such a degree that he would file a citizen's complaint. Moreover, Plaintiff's conduct involved her command of a high-profile murder investigation, not routine traffic stops. Despite Plaintiff's efforts to make them appear alike, Sergeant Lariz and Plaintiff's conduct are not comparable; and neither were the consequences. Although Plaintiff claims Sergeant Lariz's traffic stops also received media attention, the record lacks evidence showing there was a similar level of notoriety. Indeed, the President of the South Florida PBA, Leadership Monroe County, and the College of the Florida Keys contacted Ramsay in response to Plaintiff's racially charged instructions. The Record is devoid of any indication that Sergeant Lariz's traffic stops drew this kind of direct negative feedback from community organizations.

Ultimately, and in consideration of the entire record—even when viewing the record in the light most favorable to Plaintiff—Plaintiff has failed to make a prima facie showing of discrimination. Any inference of alleged discrimination here would amount to nothing more than an "inference based on speculation and conjecture[, which] is not reasonable." *See Avenue CLO Fund v. Bank of Am.*, 723 F.3d 1287, 1294 (11th Cir. 2013). Accordingly, summary judgment in Ramsay's favor is warranted. *See Maynard*, 342 F.3d at 1290 (plaintiff did not satisfy prima facie requirements for his Title VII claim, so the district court did not reach the "issue of whether [the defendant's] reasons for termination were pretextual.").

### b. Assuming Arguendo That Plaintiff Established a Prima Facie Case Against Ramsay, Plaintiff's Discrimination Claim Still Fails

Even were Plaintiff to have made a successful showing of a prima facie case of discrimination, Plaintiff's Title VII claim against Defendant fails because Defendant established a

legitimate, non-discriminatory reason for the adverse employment action and Plaintiff cannot prove that the legitimate, non-discriminatory reason for the adverse employment action was pretextual. Therefore, even were Plaintiff to have successfully made a showing of a prima facie case of discrimination, summary judgment would nevertheless be due in Defendants' favor.

### i.   *Ramsay Has a Sufficiently Legitimate Non-discriminatory Reason for the Adverse Action*

Once a plaintiff meets his burden to show a prima facie case of discrimination, "the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for his adverse action." *Walker v. Prudential Prop. & Cas. Ins.*, 286 F.3d 1270, 1274 (11th Cir. 2002) (citing *Chapman v. AI Transp.*, 229 F.3d 1012, 1028 (11th Cir. 2000)). "The burden that shifts to the defendant, therefore, is to rebut the presumption of discrimination by producing evidence that the plaintiff was [subject to an adverse employment action] for a legitimate, nondiscriminatory reason." *Tex. Dep't of Comm. Affs. v. Burdine*, 450 U.S. 248, 254 (1981). "The defendant need not persuade the court that it was actually motivated by the proffered reasons." *Id.* (citing *Bd. of Trs. of Keene State Coll. v. Sweeney*, 439 U.S. 24, 25 (1978)).

Here, there is no dispute of material fact on the record as to Ramsay's reason for Plaintiff's termination: Plaintiff directed a subordinate officer to act like a neo-Nazi, white supremacist and harass a known African American suspect in connection with a high-profile murder investigation. Her conduct led to an internal affairs investigation where both Colonel Caputo and Major Scilibia recommended termination to Ramsay at its conclusion. (RSMF ¶ 49.) Additionally, several community organizations reached out directly to Ramsay regarding the allegations against Plaintiff. The President of the South Florida PBA expressed his opinion that Plaintiff should be removed from "oversight in any capacity, including training," (*id.* ¶ 41.), Leadership Monroe County revoked Plaintiff's invitation to present at their upcoming session, (*id.* ¶ 42), and the

President of the College of the Florida Keys advised Ramsay that he revoked Plaintiff's adjunct teaching privileges and banished her from teaching at the College campus, (*id.* ¶ 43).   On this record, therefore, this Court finds that Defendants proffered a legitimate, non-discriminatory reason for the adverse employment action.

        ii.        ***Plaintiff Cannot Establish that Ramsay's Proffered Legitimate, Non-discriminatory Reason for the Adverse Action was Pretextual***

        When the defendant articulates a legitimate, non-discriminatory reason for the adverse employment action, the burden shifts back to the plaintiff to establish pretext by demonstrating "that the proffered reason was not the true reason for the employment decision . . . ." *Brooks v. Cnty. Comm'rs of Jefferson Cnty.*, 446 F.3d 1160–63 (11th Cir. 2006) (quoting *Jackson v. Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005)).   A plaintiff "may succeed in this either directly by persuading the [fact finder] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* (quoting *Jackson*, 405 F.3d at 1289).   To avoid summary judgment, a plaintiff must introduce "*significantly probative evidence* showing that the asserted reason is merely a pretext for discrimination." *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1228 (11th Cir. 1993) (citing *Young v. Gen. Foods Corp.*, 840 F.2d 825, 830 (11th Cir. 1988)).   "But a reason cannot be proved to be a 'pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515–16 (1993). "A plaintiff cannot rebut a reason 'by simply quarreling with the wisdom of that reason' or substituting [his] 'business judgment for that of the employer.'" *Patterson v. Ga. Pac., LLC*, 38 F.4th 1336, 1352 (11th Cir. 2022) (quoting *Chapman*, 229 F.3d at 1030).

        Here, Plaintiff has not put forth a single shred of evidence tending to show her termination had anything to do with her gender or sexual orientation.   In fact, despite longstanding knowledge

that Plaintiff is a homosexual woman, Ramsay promoted her several times, giving her a great deal of influence and responsibility in a high ranking, public facing position.   What's more, Ramsay replaced plaintiff with a homosexual female officer.  Plaintiff does not dispute this fact, but instead attempts to explain it away with the self-serving argument that "Defendant intentionally replaced her with [sic] homosexual female to avoid liability for sex and/or sexual orientation discrimination."  (Pl.'s Resp. RSMF ¶ 34.)  This is completely contrary to common sense and Plaintiff again provides no proof for this assertion.  Plaintiff exerts considerable effort arguing that she did nothing wrong and that her proposed ruse is common practice in law enforcement, (Pl.'s Resp. Mot. Summ. J. 5–6, ECF No. 120), but the fact that Plaintiff disagrees with Ramsay that her conduct was improper is beside the point.  "The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs." *Alvarez v. Royal Atl. Devs, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) (internal citation omitted).   The question is not whether Plaintiff's ruse was inappropriate or improper but rather, whether Defendant terminated her for directing a subordinate officer to act like a neo-Nazi, white supremacist as well as the resulting public backlash and damage to the department's reputation, or because Plaintiff is gay and/or a woman. *See id*; *Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002) (the "sole concern" is whether the decision was motivated by "unlawful discriminatory animus.").   When dealing with these issues, this Court "must be careful not to allow Title VII plaintiffs simply to litigate whether they are, in fact, good employees." *Rojas*, 285 F.3d at 1342.  This Court is not a "'super-personnel department,' and it is not [this Court's] role to second-guess the wisdom of an employer's business decisions." *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000).  Plaintiff's personal belief that her actions were appropriate is not evidence that her termination was in any way motivated by her gender or sexuality.

Plaintiff offers a litany of additional evidence, none of which this Court finds persuasive. First, Plaintiff argues that Ramsay did not actually believe she did anything wrong citing to a text message she received from Ramsay on November 14, 2019, which read, in relevant part, "please do not stress too much over the complaint. . . . we have to look into a complaint by Ms. Higgins. . . . [w]e support you and hope to clear your name!"  Plaintiff overlooks the fact that this message was sent almost a month before the investigation was completed on December 13, 2019, and before President of the South Florida PBA, Leadership Monroe County, and the President of the College of the Florida Keys reached out to Ramsay.  More importantly, that Ramsay "hoped" but later, after the completion of the investigation, found that he could not clear Plaintiff's name, has nothing to do with her gender or sexuality.  Indeed, Ramsay later explained that in his view Plaintiff made a "bad decision" which put Officer Malone and the agency "in a terrible situation" and that it "hurt this agency."  He added that the racial component "was not needed, not justified" and would "not have been authorized."

Next, Plaintiff argues that there were irregularities and inconsistencies in the investigation that show her termination was a pretext for discrimination.  Specifically, Plaintiff claims there is no factual basis as to how and why the investigation started and that Ramsay violated his own policies regarding the investigations.  (Pl.'s Resp. Mot. Summ. J. at 9.)  Plaintiff also argues that the decision not to interview her in connection with the investigation is evidence of discrimination. These arguments are not supported by the record.  It is undisputed that Higgins raised concerns with the Sheriff's Office via her October 3rd email, which prompted the initiation of internal affairs investigation case number IA-2019-046.  (RSMF ¶ 24; Reply Pl.'s Resp. RSMF ¶ 22.)  What's more, Plaintiff testified that the complaint made by Higgins and Tucker in late October 2019 was about her statements on November 20, 2017, contained in the recording.  (Phelps Depo.  41:9–14.)

Additionally, Plaintiff argues that MSCO Policy Chapter 20-A, the Internal Affairs Division Complaint Investigation Manual, "*requires* all investigations to be completed within" 30-days, and because her internal investigation was not completed within 30-days and no extension was requested, this is evidence of discrimination. (Pl.'s Resp. Mot. Summ. J. at 9.) However, Plaintiff misquotes the policy, which states "*every effort shall be made* to complete all investigations with 30 days." (Pl.'s Ex. 40); *see Blom v. WellStar Health Sys.*, 560 F. App'x 950, 955 (11th Cir. 2014) (finding no evidence of discrimination because although "an employer's deviation from its own standard procedures may serve as evidence of pretext," the record did not reflect defendant had the usual practice that plaintiff alleged was violated. (quoting *Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1299 (11th Cir. 2006))).   According to Ramsay, investigations lasting more than 30 days are not unusual and, more importantly, Plaintiff does not argue or provide any evidence that "every effort" was not made to complete the investigation within 30 days.  Moreover, Plaintiff testified that it was Inspector General Helroyd, not Ramsay, who made the decision not to interview her. (Phelps Depo. 81–82.) Plaintiff also admitted that she declined Ramsay's offer to submit a written statement to her personnel file to refute or explain the reasons given for dismissal. (*Id.* at 82.)

Plaintiff also argues that Ramsay has tolerated egregious conduct by male officers which adds to her circumstantial case for pretext.  Specifically, Plaintiff points to an instance where Sergeant Lopez referred to Plaintiff as "my dumb cunt captain" and another occasion where a male deputy touched a female deputy's chest in the presence of a sergeant. (Pl.'s Resp. Mot. Summ. J. at 8.) Plaintiff asserts that because these officers were not fired, this suggests her termination was motivated by her sex or sexual orientation. (*Id.*) Again, Plaintiff misses the mark. Sexist comments or discriminatory behavior "by non-decision makers unrelated to the employment

decision at issue are generally 'too weak to raise a genuine fact issue.'" *Williams v. Hous. Auth. of Savannah, Inc.*, 834 F. App'x 482, 490 (11th Cir. 2020) (quoting *Alvarez*, 610 F.3d at 1268); *see, e.g.*, *Williams*, 834 F. App'x at 490 (sexist comments and sexual harassment by non-decisionmakers was insufficient); *Alvarez*, 610 F.3d at 1268 (racist comment that "Cubans are dumb" made by non-decisionmaker was insufficient).

Ultimately, Plaintiff "presents no other evidence other than her own unsubstantiated allegations," which are not sufficient to defeat summary judgment. *Barnette v. Fed. Express Corp.*, 491 F. App'x 176, 183 (11th Cir. 2012). This Court has reviewed the record in the light most favorable to Plaintiff and considered her remaining arguments for pretext and finds them unavailing. Plaintiff has failed to show Ramsay's legitimate, non-discriminatory reason for her termination was not the true reason for his employment decision. Therefore, Ramsay is entitled to summary judgment.

Plaintiff attempts to repeat her arguments in conclusory fashion using the same evidence under alternative legal doctrines including the mixed motive and convincing mosaic analysis. Shifting legal doctrines does not change the outcome on the facts of this case, but nevertheless, this Court will briefly address each of these doctrines below.

### c.  Plaintiff's Discrimination Claim Fails Under the Mixed-Motive Analysis

"An employee can succeed on a mixed-motive claim by showing that illegal bias, such as bias based on sex or gender, 'was a motivating factor for' an adverse employment action, 'even though other factors also motivated' the action." *Quigg*, 814 F.3d at 1235 (quoting 42 U.S.C. § 2000e–2(m)). "[M]ixed-motive discrimination claims can be established with either direct or circumstantial evidence." *Id.* (citing *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99–102 (2003)).

"*McDonnell Douglas* is not 'the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case.'" *Quigg*, 814 F.3d at 1240 (citing *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)). "Rather, the crux of the analysis at the summary judgment stage is whether the plaintiff has offered sufficient evidence to establish a genuine issue of discrimination." *Id.* "Accordingly, 'the plaintiff will always survive summary judgment if [s]he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent.'" *Id.*

"Regardless of the theory of discrimination, '[the] sole concern is whether unlawful discriminatory animus motivated the decision.'" *Williams*, 834 F. App'x at 488 (quoting *Alvarez*, 610 F.3d at 1266). This Court does "not sit as a super-personnel department, and it is not our role to second-guess the wisdom of an employer's business decisions—indeed the wisdom of them is irrelevant—as long as those decisions were not made with a discriminatory motive." *Alvarez*, 610 F.3d 1266 (internal quotations omitted). Thus, "an employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1363 n.3 (11th Cir. 1999). "And, in carrying out its business and in making business decisions (including personnel decisions), the employer can lawfully act on a level of certainty that might not be enough in a court of law." *EEOC v. Total Sys. Servs.*, 221 F.3d 1171, 1176–77 (11th Cir. 2000).

As previously stated, the record evidence, even considered in the light most favorable to Plaintiff, does not reflect that Plaintiff's sex or sexual orientation played any role whatsoever in her termination. Ramsay, who promoted Plaintiff several times to high-ranking positions knowing she was a gay woman, after a thorough investigation and overwhelming input from community organizations, terminated Plaintiff for her decision to instruct a subordinate officer to act like a

neo-Nazi, white supremacist and harass a black suspect during a high-profile investigation. Nothing in the record suggests otherwise. Plaintiff cannot offer a single piece of evidence tending to show her sex or sexual orientation were even partly considered in the decision to terminate. *See Williams*, 834 F. App'x at 489 (holding plaintiff failed to show her employer "was motivated by bias against her sex when it fired her" even where she "presented evidence that she was subjected to sexually objectifying comments, nonconsensual touching, [] an attempted nonconsensual kiss while working[,] . . . that a higher-level [] employee failed to prevent and in fact participated in this unacceptable conduct, [and that] it is undisputed that [her employer] fired her shortly after she complained about this incident."). Indeed, the evidence here is akin, albeit weaker, to the evidence considered in *Williams* where the Eleventh Circuit still found no mixed-motive in the employer's decision to terminate. More importantly, here, not only is this case the first time Plaintiff has accused Ramsay of sexist or homophobic behavior towards her, certifying each year that she was not discriminated against in the course of her employment and never once mentioning any kind of discrimination during the process of her termination, but Ramsay replaced Plaintiff with another homosexual female officer. Therefore, there is still no dispute of material fact regarding a possible discriminatory motive for Plaintiff's termination even under a mixed-motive analysis.

### d.  Plaintiff's Discrimination Claim Fails Under the Convincing Mosaic Analysis

If an employee's case fails within the *McDonnell Douglas* framework, the employee can still survive summary judgment by providing "circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Jenkins v. Nell*, 26 F.4th 1243, 1250 (11th Cir. 2022) (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)). "A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional

discrimination by the decisionmaker." *Smith*, 644 F.3d at 1328 (internal quotation marks omitted). "A plaintiff may establish a convincing mosaic by pointing to evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) 'systematically better treatment of similarly situated employees,' and (3) pretext." *Jenkins*, 26 F.4th at 1250 (quoting *Lewis II*, 934 F.3d at 1185).

As support for her argument under the convincing mosaic theory, Plaintiff relies solely on the Eleventh Circuit's recent opinion in *Jenkins*. In that case, a white male crane operator brought suit for race discrimination against his supervisor, a black male, in connection with his termination. *Jenkins*, 26 F.4th at 1246–48. The Eleventh Circuit found a convincing mosaic existed where (1) another employee, although not a strict comparator under *McDonnell Douglas*, violated the same rule as the plaintiff and was not terminated; (2) at least 18 white crane operators retired, resigned, or transferred from the department since the defendant took over; (3) there was evidence that the defendant mistreated three white crane operators; (4) the defendant had a close and influential relationship with Human Resources; (5) the defendant made racially-biased comments about white crane operators; (6) the plaintiff declining to change his accident report about a hard landing; and (7) the defendant's shifting reasons for terminating Jenkins. *Id.* at 1250–51. Importantly, although the defendant did not make racially-biased remarks around the plaintiff's termination, two black former employees stated that the defendant previously made comments that he believed the white crane operators to be racist and unwilling to work for a black man. *Id.* at 1248. Additionally, one of those former employees testified that the defendant specifically referred to the plaintiff and another former crane manager as racists and both former employees testified that the defendant referred to social meetings of past and present crane operators, the majority of whom were white, as "Klan meetings." *Id.*

Here, Plaintiff summarily argues that "she has presented more evidence than the plaintiff in *Jenkins* and it is sufficient to withstand summary judgment." (Pl.'s Resp. RMSJ ¶ 13.)  This Court disagrees.  Plaintiff's proffered evidence of discrimination falls well outside the realm of *Jenkins*.  First, Plaintiff cannot point to any other officer who was accused of even remotely similar conduct.  Second, Plaintiff cannot point to a single homosexual female officer who retired, resigned, or transferred since Ramsay took over as Sheriff.  In fact, he hired a homosexual female to replace Plaintiff.  Among the plethora of chronic deficiencies in Plaintiff's proffered evidence of discrimination is the fact that Plaintiff's claims against Ramsay are completely uncorroborated. Plaintiff relies solely on her own opinion that Ramsay is sexist and harbors animosity against her for being homosexual.  This is in stark contrast to *Jenkins* where the plaintiff presented witnesses who testified that the defendant made comments which directly support the contention that plaintiff was fired because he was a white male.  This Court also notes that, unlike in *Jenkins*, Ramsay has not wavered at all in his reason for terminating Plaintiff.  Plaintiff's personal disagreement with Ramsay's decision is not evidence of discrimination.  When viewing the evidence in the light most favorable to Plaintiff, and even crediting only Plaintiff's account of the facts, there is still no dispute of material fact regarding a possible discriminatory motive for Plaintiff's termination even under a convincing mosaic theory.

### e.  Ramsay is Entitled to Qualified Immunity

To establish he is entitled to the protections of qualified immunity, Ramsay must show that he acted within the scope of his discretionary authority in performing the challenged conduct, and if so, the plaintiff has the burden to demonstrate that: (1) the defendant violated a constitutional right, and (2) the right was clearly established at the time of the alleged violation.  *Morris v. Town of Lexington*, 748 F.3d 1316, 1322 (11th Cir. 2014).  "The contour of the right must be sufficiently

clear that a reasonable official would understand that what he is doing violates that right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  This "clearly established" prong demands consideration of the law "in light of the specific context of the case, not as a broad general proposition." *Rioux*, 520 F.3d at 1282 (internal quotation omitted).

Here, it is undisputed that Ramsay's decision to terminate Plaintiff was within his discretionary authority and that Plaintiff's right against employment discrimination based on her sex and/or sexual orientation is a clearly established right. *Montoya v. Morgan*, No. 3:16-cv-92-MCR/EMT, 2018 U.S. Dist. LEXIS 168593, at *54-55 (N.D. Fla. Sep. 30, 2018) (Sherriff's termination of Plaintiff within Sherriff's discretionary authority); *Cross v. State of Ala. Dep't of Mental Health & Mental Retardation*, 49 F.3d 1490, 1507 (11th Cir. 1995) (stating equal protection prohibits sex discrimination and sexual harassment in public employment).  The inquiry, therefore, turns on whether Ramsay violated Plaintiff's clearly established constitutional right.  As detailed above, he did not.  Ramsay had a legitimate and lawful motivation for Plaintiff's termination, namely her instruction to a subordinate officer to act like a neo-Nazi, white supremacist during a traffic stop of a black man coupled with the resulting widespread backlash and damage to the department's reputation in the community.  *See Autery v. Davis*, 355 F. App'x 253, 256 (11th Cir. 2009) ("we held that a public official is entitled to qualified immunity when the record establishes at least some lawful motivation for his conduct, in spite of opposing inferences" (citing *Foy v. Holston*, 94 F.3d 1528, 1536 (11th Cir. 1996))); *Rioux*, 520 F.3d at 1284–85 (determining a defendant is entitled to qualified immunity if the undisputed record shows "that the defendant in fact was motivated, *at least in part*, by lawful considerations").  Therefore, Ramsay is entitled to qualified immunity.

## B. *The Individual Defendants' Arguments*

The Individual Defendants argue that (1) all of the alleged defamatory statements attributable to them were true and or statements of opinion; (2) because Plaintiff is a public figure the statements do not have the be true and even if made with ill will, that is insufficient to establish that Plaintiff was defamed; and (3) Plaintiff cannot maintain a claim for civil conspiracy because under Florida Law a civil conspiracy is not actionable by itself and Plaintiff's defamation claims fail. (JTH Mot. at 5, 17.)

At the outset, this Court notes that Plaintiff attempts to argue for the first time in opposition to summary judgment that several statements at issue constitute defamation *per se*. (*See* Pl.'s Resp. Mot. at 2–4.) Defamation *per se* and defamation are separate and distinct claims. *Ludwin v. Proman*, No. 20-CV-81755-RS, 2023 U.S. Dist. LEXIS 41059, at *10–11 (S.D. Fla. Jan. 24, 2023) (noting that defamation and defamation *per se* are "two distinct claims"); *Zimmerman v. Buttigieg*, 576 F. Supp. 3d 1082, 1098 (M.D. Fla. 2021) ("[D]efamation by implication and defamation *per se* are mutually exclusive causes of action."); *Border Collie Rescue, Inc. v. Ryan*, 418 F. Supp. 2d 1330, 1352 n.24 (M.D. Fla. 2006) ("In defamation *per se* actions, the defamatory statement (written or oral) is actionable on its face" whereas "[i]n defamation *per quod* actions, additional explanation of the words are necessary to show they have a defamatory meaning . . ."). This Court declines to consider Plaintiff's arguments based on claims not contained in the Amended Complaint. *See Miccosukee Tribe of Indians of Fla. v. United States*, 716 F.3d 535, 559 (11th Cir. 2013) ("[A] plaintiff cannot amend his complaint through argument made in his brief in opposition to the defendant's motion for summary judgment."); *Flintlock Constr. Servs., LLC v. Well-Come Holdings, LLC*, 710 F.3d 1221, 1227–28 (11th Cir. 2013) (declining to consider claims raised for the first time in a plaintiff's response to a motion for summary judgment because, "[a]t the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend

the complaint"). This Court finds Plaintiff's attempt to circumvent the need for record evidence showing actual malice with her newly minted defamation *per se* claims unavailing.

### 1. HIGGINS, TUCKER AND JENAI CANNOT BE HELD LIABLE FOR DEFAMATION

"If the injured party is a public figure or official and the defamatory material involves issues of legitimate public concern, the plaintiff must prove that the defendant acted with actual malice to establish liability." *Silvester v. Am. Broad. Cos.*, 839 F.2d 1491, 1493 (11th Cir. 1988) (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 281–82 (1964)) "Under state tort law, a police officer is deemed a public figure as a matter of law." *Medina v. City of Hialeah*, No. 02-20957-CIV, 2003 U.S. Dist. LEXIS 4890, at *6 (S.D. Fla. Mar. 19, 2003) (citing *Smith v. Russell*, 456 So. 2d 462, 463–64 (Fla. 1984)). "A police officer's alleged wrongful conduct or [her] lack of fitness for duty" are "matters of serious public concern." *Medina*, 2003 U.S. Dist. LEXIS 4890, at *6–7 (citing *City of Mia. v. Wardlow*, 403 So. 2d 414, 415–16 (Fla. 1981)).

Here, Plaintiff is a high-ranking police officer, and the alleged defamatory statements concern her alleged wrongful conduct in connection with the Treehouse Murder investigation and her fitness for duty as a result of that conduct. Therefore, Plaintiff must show actual malice to maintain an action for defamation.

The landmark case on the relationship between defamation and the protections of the First Amendment, *New York Times*, emphasizes the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." 376 U.S. at 270. Given the importance of the First Amendment's "guarantees," a public figure cannot prevail in a defamation lawsuit unless he demonstrates, by clear and convincing evidence, that the defendants published the allegedly defamatory statements with "actual malice,"

meaning "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times*, 376 U.S. at 279–80; *Harte-Hanks Commc'ns., Inc. v. Connaughton*, 491 U.S. 657, 659 (1989). "That is, [she] must be able to show—well beyond a preponderance of the evidence—that the defendants published a defamatory statement either with actual knowledge of its falsity or with a 'high degree of awareness' of its 'probable falsity.'" *Berisha v. Lawson*, 973 F.3d 1304, 1312 (11th Cir. 2020) (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964)). The actual malice standard "is a subjective test, which asks whether the [defendants] '*in fact* entertained serious doubts as to the truth of [their] publication[s].'" *Berisha*, 973 F.3d at 1312 (*quoting Silvester*, 839 F.2d at 1498). In other words, Plaintiff must produce evidence that the defendants "actually entertained serious doubts as to the veracity of the published account, or [were] highly aware that the account was probably false." *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 703 (11th Cir. 2016).

In the context of a motion for summary judgment in this public-figure defamation case, the burden is on Plaintiff to "present record evidence sufficient to satisfy the court that a genuine issue of material fact exists which would allow a jury to find by clear and convincing evidence the existence of actual malice on the part of the defendant[.]" *Mile Marker, Inc. v. Petersen Publ'g, L.L.C.*, 811 So. 2d 841, 846–47 (Fla. 4th DCA 2002); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986) (stating a court must determine "whether the evidence presented is such that a reasonable jury might find that actual malice had been shown with convincing clarity").

Plaintiff contends that proving actual malice, by its nature, involves questions of intent, and thus, the mere presence of such issues will always defeat summary judgment because intent is always a question for the jury. Plaintiff's reliance on this overstatement of the law is misplaced. Indeed, summary judgment is routinely granted where, as here, the plaintiff fails to put forth "even

a scintilla of evidence—much less clear and convincing proof of—actual malice." *Grayson v. No Labels, Inc.*, No. 6:20-cv-1824, 2022 U.S. Dist. LEXIS 96317, at *18 (M.D. Fla. May 20, 2022); *see, e.g.*, *Medina*, 2003 U.S. Dist. LEXIS 4890, at *8 (granting summary judgment because "[w]hile it is true that City officials, such as the Police Chief made statements that stigmatized [plaintiff] to the media, Plaintiff has not produced any evidence to show that the City officials knew that they were false"); *Silvester*, 839 F.2d at 1499 (affirming district court's grant of summary judgment and quoting the district court's reasoning that "there is no evidence that defendants doubted the truth of" the alleged defamatory statements).

The only argument Plaintiff offers in support of actual malice pertains to Tucker's statement that Plaintiff instructed Deputy Malone to make an *illegal* stop. Plaintiff argues that Tucker knew this was a false statement because on the recording she says to act like a neo-Nazi, white supremacist and make a *legal* stop. However, merely because Plaintiff said to make a legal stop does not mean her ruse necessarily would have been conducted legally or more importantly, that Tucker thought what Plaintiff said on the recording was legal. Tucker was aware that Plaintiff was terminated for giving that very instruction and believed Plaintiff was framing him for murder as part of what he viewed as a corrupt investigation. Furthermore, Tucker could not have knowledge of the legality of a stop that never occurred. Plaintiff does not put forth any evidence tending to show that Tucker in fact thought the proposed ruse was legal.

Beyond Plaintiff's own opinion that the various allegedly defamatory statements were false and part of a broad conspiracy to discredit her, she offers no evidence that the Individual Defendants entertained serious doubts or were highly aware that their statements were probably false. It is not enough to show the "existence of a false statement," the "failure to conduct a thorough and objective investigation," or even "ill will" on the part of a defendant. *Edward Lewis*

*Tobinick, MD v. Novella*, 848 F.3d 935, 946–47 (11th Cir. 2017).  Plaintiff's failure to focus on whether or not the statements at issue were published with actual malice proves fatal to her claims. This Court finds, as a matter of law, that no jury could find by clear and convincing evidence the existence of actual malice in any of the statements at issue.  Plaintiff makes a variety of arguments in an attempt to overcome the Individual Defendants' motion for summary judgment on the issue. None succeed.  "Plaintiff's conspiracy theory falls far short of establishing actual malice by clear and convincing evidence." *Berisha v. Lawson*, 378 F. Supp. 3d 1145, 1161 (S.D. Fla. 2018), *aff'd*, 973 F.3d 1304 (11th Cir. 2020).

### 2.  PLAINTIFF'S CIVIL CONSPIRACY CLAIM FAILS

Florida does not recognize an independent action for conspiracy.  *Churruca v. Mia. Jai-Alai, Inc.*, 353 So. 2d 547, 550 (Fla. 1977); *Hoch v. Rissman, Weisberg, Barrett*, 742 So. 2d 451, 460 (Fla. 5th DCA 1999).  Under Florida law, a civil conspiracy is derived from the underlying claim that forms the basis of the conspiracy. *Czarnecki v. Roller*, 726 F. Supp. 832, 840 (S.D. Fla. 1989).  A claim that is found not to be actionable cannot serve as the basis for a conspiracy claim. *Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1217 (11th Cir. 1999) (applying Florida law); *Lake Gateway Motor Inn, Inc. v. Matt's Sunshine Gift Shops, Inc.*, 361 So. 2d 769, 772 (Fla. 4th DCA 1978).

Here, "because the defamation claims are not viable, the civil conspiracy claim also fails, and summary judgment in favor" of the Individual Defendants is warranted.  *Grayson*, 2022 U.S. Dist. LEXIS 96317, at *18 (internal citations omitted); *Alhassid v. Bank of Am., N.A.*, 60 F. Supp. 3d 1302, 1316 (S.D. Fla. 2014) (holding a civil conspiracy must be based on "an underlying illegal act or tort").

IV.    CONCLUSION

For the foregoing reasons, it is **ORDERED AND ADJUDGED** that:

1.    Ramsay's Motion, (ECF No. 111) is **GRANTED**.

2.    JTH's Motion, (ECF No. 115), is **GRANTED**.

3.    Final Judgment shall issue by separate order.

4.    This case is **CLOSED** and all pending motions are **DENIED as moot**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 2 0 day of March, 2023.

_____
JOSE E. MARTINEZ
UNITED STATES DISTRICT JUDGE

Copies provided to:
Magistrate Judge Becerra
All Counsel of Record

41